James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Jay W. Eisenhofer
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York  10017
(646) 722-8500

*Counsel for Plaintiff*

Reuben A. Guttman
GRANT & EISENHOFER P.A.
1920 L Street NW, Suite 400
Washington, DC  20036
(202) 386-9500

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
(312) 214-0000

Sergei Lemberg
LEMBERG & ASSOCIATES LLC
1100 Summer Street
Stamford, Connecticut  06905
(203) 653-2250

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KERRY O'SHEA, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CAMPBELL SOUP COMPANY and AMERICAN HEART ASSOCIATION, INC.,<br><br>Defendant. | Civil Action No.<br><br><br>**COMPLAINT and<br>DEMAND FOR JURY TRIAL** |

Plaintiff Kerry O'Shea, individually and on behalf of all others similarly situated (the "Class," as defined below), by her undersigned counsel, brings this action against defendants the Campbell Soup Company ("Campbell's") and the American Heart Association, Inc. ("AHA") (collectively, "Defendants"), and upon information and belief and investigation of counsel, allege as follows:

## NATURE OF THE CASE

1.      The AHA claims that its mission is "to build healthier lives, free of cardiovascular diseases and stroke.  That single purpose drives all we do."  This worthy mission is, in truth, tainted by what the AHA does not tell the public:  that for a fee, the AHA will allow manufacturers of unhealthy, processed foods – including over thirty varieties of Campbell's canned soups – to place the AHA's certification and endorsement on products that run directly counter to the AHA's stated mission.

2.      The AHA's nationally recognized "Heart-Check Mark" certification thus fools consumers by misrepresenting that products bearing the Heart-Check Mark certification meet the AHA's heart-healthy nutritional guidelines.  That misrepresentation (or omission of the true facts) is unfair, deceptive, and misleading, because the AHA's Heart-Check Mark certification does not signify adherence to those guidelines.

3.      Properly characterized, the real meaning of the AHA's Heart-Check Mark certification is, "Unhealthy, but maybe not as bad for you as other products."

4.      As alleged herein, the AHA, for a fee, abandons its general, non-commercial dietary and nutritional guidelines – which categorically rule out unhealthy processed products, including Campbell's soups, as demonstrated below – and agrees to certify as heart-healthy products that merely meet the minimum criteria for certain FDA-regulated health claims, rather than the AHA's own more demanding standards.  This deceptive practice not only causes consumers to overpay for Campbell's AHA-certified soups, but also presents substantial health risks to all consumers, including the more than five million American consumers suffering from congestive heart failure.

5.     The AHA's Heart-Check Mark certification scheme runs directly counter to its non-commercial nutritional guidance.  Instead of aiding the consuming public, the AHA's certification scheme confuses and misleads the consuming public, because it employs standards that have nothing to do with the AHA's general nutritional guidelines.

6.     As a result, the AHA certifies products that are far less healthy, and far less heart-healthy, than it otherwise advises consumers to eat.  A single serving of Campbell's AHA-certified soups contains nearly three times the amount of sodium permitted by the AHA's non-commercial nutritional guidelines, while a full can contains between six and seven times that amount.

7.     This case is not only about AHA's willingness to mislead consumers for a fee; it is also about the manufacturers who are willing to pay that fee, and funnel other monies to the AHA, in furtherance of schemes to prey upon consumer demand for products that are legitimately healthy.

8.     Indeed, manufacturers, including Campbell's, buy AHA approval, by paying a fee on a per-product basis, plus administrative costs and fees, plus additional annual fees to maintain their AHA heart-healthy product certifications and to claim endorsement and certification by that widely-trusted organization.

9.     By the AHA selling, and Campbell's buying, the right to affix the AHA's seal of approval to its products, they falsely represent to the public that AHA-certified products manufactured by Campbell's possess some cardiovascular benefit not enjoyed by products that have not been certified by the AHA.  In truth, however, the *only* difference between AHA-certified Campbell's products and non-certified competing products is that Campbell's has paid money to the AHA to license its logo.

10.     In sum, the AHA benefits from the monies paid to it by food manufacturers and the advertising and organizational name recognition that come from having its logo placed on millions of food containers.  Campbell's benefits by being able to affix the AHA's Heart-Check Mark logo on the products for which it has paid for it and is able to enjoy increased sales and higher profits due to their premium pricing and perceived health advantage.  These benefits to Campbell's and AHA, however, come at the substantial cost to Plaintiff and the other Class members, both in the form of purchasing falsely labeled products based on Defendants "heart-healthy" pretext, and materially overpaying for those products.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

12.     The Court has personal jurisdiction over the AHA because the AHA has purposefully availed itself of the privilege of conducting business activities in the State of New Jersey by advertising in the State of New Jersey (including by inserting its logo on certain Campbell's products sold in the State of New Jersey).  Additionally, the AHA has maintained systematic and continuous business contacts with the State of New Jersey, and is registered to conduct business in this State.

13.     The Court has personal jurisdiction over Campbell's because Campbell's is headquartered in the State of New Jersey and has purposefully availed itself of the privilege of conducting business activities in the State of New Jersey by advertising and selling its

manufactured goods (including the Healthy Request soup products at issue) within the State of New Jersey.  Additionally, Campbell's is registered to conduct business in this State.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because much of the conduct forming the basis for this action occurred within this District, including Campbell's production and distribution of the Healthy Request soups purchased by Plaintiff and the other Class members, and of the marketing materials promoting those soups.

## PARTIES

15.    Kerry O'Shea is a citizen of the State of California, residing in Huntington Beach in the County of Orange.  O'Shea purchased products manufactured, marketed and sold by Campbell's that included on their labels the AHA's Heart-Check Mark symbol, including: condensed Chicken Noodle soup; condensed Cream of Mushroom soup; condensed Cream of Chicken soup; uncondensed Beef with Country Vegetables soup; uncondensed Chicken with Corn Chowder soup; uncondensed Chicken with Whole Grain Pasta soup; uncondensed Classic Chicken Noodle soup; uncondensed Grilled Chicken and Sausage Gumbo soup; uncondensed Italian-style Wedding soup; uncondensed New England Clam Chowder soup; uncondensed Old Fashioned Vegetable Beef soup; uncondensed Roasted Chicken with Country Vegetables soup; uncondensed Sirloin Burger with Country Vegetables soup; uncondensed Split Pea with Ham soup; uncondensed Vegetable soup.

16.    O'Shea purchased these products at numerous locations throughout Orange County, California, but predominantly at Ralph's in Huntington Beach, California and Albertson's in Huntington Beach, California.  O'Shea purchased one or more of these products approximately two times per week during each of the following months: February 2009; March 2009; November 2009; December 2009; January 2010; February 2010; March 2010; November

2010; December 2010; January 2011; February 2011; March 2011; November 2011; December 2011; January 2012; February 2012; March 2012; November 2012; December 2012; January 2013; February 2013; and March 2013.

17.     In deciding to purchase the products set forth above, O'Shea reviewed and considered the statements and other information contained in the product labels, including the AHA Heart-Check Mark certification, and relied upon their accuracy, completeness, and truth. As a result of those statements and other information, as detailed more fully herein, O'Shea believed the products set forth above were low sodium products that conformed to AHA's dietary and nutritional guidelines and possessed cardiovascular benefits not enjoyed by competing products not certified by AHA.

18.     Contemporaneously with their publication, O'Shea saw and considered the advertisements and marketing materials set forth in this Complaint, and relied upon the accuracy, completeness, and truth of the statements and other information provided therein.  As a result of the statements and other information contained in those advertising and marketing materials, as detailed more fully herein, O'Shea believed the products set forth above were low sodium products that conformed to AHA's dietary and nutrition guidelines and possessed cardiovascular benefits not enjoyed by competing products not certified by AHA.

19.     Campbell's is a corporation organized under the laws of New Jersey with its principal place of business in Camden, New Jersey.  Campbell's manufactures and labels a line of packaged soup products marketed under the name, "Healthy Request."  At present, at least 33 Healthy Request soup products are certified by the AHA and display the Heart-Check Mark on their labels and in advertising material.  Campbell's markets these products using nationally uniform product labels and advertisements.

20.     The AHA is a non-profit organization headquartered in Dallas, Texas.   The nation's oldest and largest voluntary organization dedicated to fighting cardiovascular diseases, the AHA purportedly aims to build "healthier lives, free of cardiovascular diseases and stroke." The AHA includes the American Stroke Association, which was created in 1997 as a division of the AHA to bring together the stroke-related activities of the organization.   The AHA purportedly seeks to improve America's cardiovascular health, through various efforts, including its public health education programs. Such programs claim to help the public understand the importance of healthy lifestyle choices, such as controlling blood pressure and eating foods low in sodium, saturated fat and cholesterol.

## FACTUAL ALLEGATIONS

*Introduction*

21.     The AHA licenses its Heart-Check Mark logo to manufacturers of products that purportedly satisfy the AHA's independent heart-health criteria, as reflected in the nutritional guidelines it provides to consumers.

22.     In contrast, the criteria the AHA uses when selling its Heart-Check Mark certification to food manufacturers such as Campbell's are nothing more than the FDA's minimum criteria, rather than the AHA's own higher standards.

23.     In other words, the AHA's certification is intended to signify to consumers that AHA-certified products are associated with cardiovascular benefits *above and beyond* that which is enjoyed by non-certified products in compliance with the FDA's minimal heart-health regulations.

24.     The AHA, however, will certify and sell its Heart-Check Mark certification for placement on products that run directly contrary to its legitimate mission to promote heart health

7

and which unequivocally violate its own general, *non-commercial* healthy-eating guidance to the public.

25.    The AHA issues hundreds of public communications that are unrelated to the Heart-Check Mark certification program each year, and these uniformly advise consumers to choose foods that meet the FDA's standards for "low sodium" foods, among other things.  The AHA, however, has certified numerous products that fail to meet the AHA's own standards in exchange for payment.

26.    While the AHA benefits from the fees paid to it by food manufacturers (including Campbell's) and the advertising and name-recognition that comes from having its logo emblazoned on millions of food containers, and Campbell's benefits through increased sales and premium pricing for AHA-certified products, consumers end up only with falsely labeled products for which they have materially overpaid, or would not have purchased at all, had Defendants told them the truth about those products.

27.    None of Campbell's AHA-certified products meet the AHA's own non-commercial dietary and nutrition standards because those products' sodium levels – 410 milligrams per serving, or between 820 and 1,025 milligrams per unit – far exceed the AHA's (and the FDA's) low-sodium threshold of 140 milligrams of sodium per serving.

28.    Further, Campbell's advertises its AHA-certified products in print and broadcast media, as well as on its Internet website, with language conveying a uniform message that is calculated to mislead and deceive consumers about the level of sodium in those products.

29.    Campbell's claims that its AHA-certified products contain "lower sodium," "a healthy level of sodium," and have been "controlled for sodium."  For example, the following advertisement appeared in the *Better Homes and Gardens* magazine in February 2009:



Surprise. It's lower sodium.



Campbell's® *Healthy Request*® Soups
— all 25 choices —
have our lower sodium natural sea salt
added for taste you can actually taste.

AD CODE: CAMPFB-1124    SOURCE: Better Homes and Gardens-FEB 1 09

30.     *None* of these assertions is true, however, and all are designed to deceive or otherwise mislead consumers into thinking that Campbell's products are low-sodium products, when the truth about those products runs directly contrary to those certified misrepresentations.

31.     Moreover, Campbell's sells its AHA-certified Healthy Request soup products at a price premium over both Campbell's own non-certified products and non-certified competing products.  Defendants' deception with respect to these products thus enables Campbell's to reap substantial profits therefrom.

*Inconsistencies Between AHA's General Consumer Guidance And Its Heart-Check Mark Certification Scheme*

32.     The AHA regularly communicates its dietary, nutrition, and health guidance to the public.  It conveys that message in various ways, including direct mailings, websites, print and broadcast advertisements, pamphlets and fliers distributed at hospitals, clinics, and

physicians' offices across the country, academic journal articles, periodic newsletters and bulletins, public conferences, meetings, and other sponsored events, position papers, fundraisers, and many other media.

33.     The AHA's dietary and nutritional guidance is based on a substantial body of scientific research.  This guidance is offered to consumers in accordance with the AHA's mission, which is characterized as:  "Building healthier lives, free of cardiovascular diseases and stroke."

34.     The AHA regularly updates its dietary and nutritional guidance to keep up with the latest scientific and medical findings.  Recently, the AHA has focused on calling attention to sodium overconsumption and to the importance of controlling blood pressure.

35.     In a 2011 article published in the journal *Circulation* as an "AHA Presidential Advisory," the AHA highlighted the "direct, progressive, consistent and continuous relationship between blood pressure and adverse health outcomes" and asserted that "[s]trong evidence implicates excess sodium intake with elevated blood pressure."

36.     The *Circulation* advisory communicates the following about the gravity of the threat posed by high blood pressure and the decisive link between blood pressure and sodium consumption:

> Blood pressure (BP)-related diseases, specifically, stroke, coronary heart disease, heart failure, and kidney disease, are leading causes of mortality and morbidity in the United States and throughout the world.  In the United States, coronary heart disease and stroke are the leading causes of mortality, whereas heart failure is the leading cause of hospitalizations.  Concurrently, the prevalence of chronic kidney disease remains high and is escalating.  **The direct and indirect costs of these conditions are staggering, over $400 billion just for cardiovascular disease (CVD) in 2009.  The human consequences are likewise enormous**.
>
> The relation between BP and adverse health outcomes is direct and progressive with no evidence of a threshold….  Overall, elevated BP is the second leading modifiable cause of death, accounting for an estimate 395,000 preventable deaths

10

in the United States in 2005. … Two of the key metrics for ideal cardiovascular health are a BP of <120/80 mm Hg and sodium consumption of <1500 mg/d. **The purpose of this advisory is 2-fold: first is to highlight the impressive body of evidence that links sodium intake with elevated BP and other adverse outcomes, and second, to serve as a call to action on behalf of the AHA for individuals, healthcare providers, professional organizations, governments, and industry to address this major public health issue**.

Appel LJ, *et al.*, "The Importance of Population-Wide Sodium Reduction as a Means to Prevent Cardiovascular Disease and Stroke: A Call To Action from the American Heart Association," *Circulation* 2011; 123:1138-1143 (emphasis added).

37.     At present, the AHA advises consumers to abide by the following dietary restrictions, among others:

> a.  "The American Heart Association recommends consuming less than 1500 milligrams of sodium a day" (AHA, *Shaking the Salt Habit* pamphlet/website);
>
> b.  "[F]oods with less than 140 milligrams or 5 percent of the Daily Value (DV) per serving are low in sodium. … Choose unsalted nuts and low-sodium or no salt added canned foods. … Use products made without added salt[.]" (AHA, *Answers by Heart: Lifestyle and Risk Reduction – High Blood Pressure* pamphlet/website);
>
> c.  "Choose … low-sodium or no salt added canned foods" (AHA, *Answers by Heart: Lifestyle and Risk Reduction – High Blood Pressure* pamphlet/website);
>
> d.  "Use products made without added salt; try low-sodium bouillon and soups and unsalted, fat-free broth" (AHA, *Answers by Heart: Lifestyle and Risk Reduction – High Blood Pressure* pamphlet/website);
>
> e.  "Choose and prepare foods with little or no salt" (AHA, "New Diet and Lifestyle Recommendations At a Glance" news release);
>
> f.  "Reduce salt intake, including salt from processed foods" (AHA, "New Diet and Lifestyle Recommendations at a Glance" news release);
>
> g.   "Always use the lowest-sodium products available. These may be labeled 'sodium-free,' 'salt-free,' 'no-salt-added,' 'very-low sodium,' or 'low-sodium.' The difference between these products and their 'regular' counterparts can be very significant" (AHA, *Low-Salt Cookbook*, 4th edition (2012));

h. "Commercial soups and bouillon cubes … can 'secretly' but significantly increase salt content, so shop for the no-salt-added or low-sodium varieties" (AHA, *Low-Salt Cookbook*, 4th edition (2012));

i. Canned soups are one of the "Salty Six" categories of processed foods high in sodium (AHA, "Salty Six – Common Foods Loaded With Excess Sodium" website);

j. "[H]ere is the scoop on soup: All canned varieties can have high amounts of sodium" (AHA, Sodium Quiz website).

38.     The AHA's dietary guidance, and the research on which it is based, is intended to be non-commercial and disinterested.  It is intended to represent the AHA living up to its mandate by *aiding* the consuming public in making heart-healthy decisions according to definite, practical, and sensible guidelines.

39.     The AHA's Heart-Check Mark certification scheme, however, runs directly counter to its own guidance.  Instead of aiding the consuming public, the AHA's certification scheme confuses and misleads the consuming public, because it employs standards that have nothing to do with the AHA's general nutritional guidelines.  As a result, the AHA certifies products that are far less healthy, and far less heart-healthy, than it otherwise advises consumers to eat.

40.     Indeed, notwithstanding the AHA's own recommendations, under the criteria set forth in the AHA's Heart-Check Mark certification scheme, products may contain *up to 480 milligrams of sodium per serving* and still receive the AHA's seal of approval.  This standard, therefore, permits unhealthy processed foods that fail to meet the AHA's general nutritional guidelines to bear the AHA's logo and enjoy the AHA's recommendation.

41.     The Heart-Check Mark certification scheme therefore creates the false impression that those products abide by the AHA's nutritional guidelines when, in fact, they do not.

42.     The message conveyed to consumers by the AHA and companies using the AHA Heart-Check Mark symbol, including Campbell's, is clear: AHA-certified foods comply with the AHA's general consumer guidance.

43.     Indeed, the AHA admits as much, stating that: "[w]hen you see the Heart-Check Mark on food packaging, you'll instantly know the food has been certified to meet the American Heart Association's guidelines for a heart-healthy food."  As depicted below, the AHA's Heart-Check Mark symbol itself says, "Meets Criteria For Heart-Healthy Food."  As discussed above, however, these assertions are flatly untrue.



44.     By its Heart-Check Mark certification symbol, the AHA – and the companies buying the use of the AHA's certification symbol, including Campbell's – tells consumers that certified products adhere to a standard higher than the FDA's minimum requirements, but this is false.

45.     Under FDA regulations, manufacturers may place on product labeling statements and images that link the product to a reduced risk of heart disease if the product is low in fat (under three grams per reference amount customarily consumed, *see* 21 C.F.R. § 101.62(b)(2)(i)(A)), saturated fat (one gram or less per reference amount customarily consumed,

*see* 21 C.F.R. § 101.62(c)(2)(i)), and cholesterol (20 milligrams or less per reference amount customarily consumed, *see* 21 C.F.R. § 101.62(d)(2)(i)(A)).  *See* 21 C.F.R. § 101.75(c)(ii).  Any food product containing more than 480 milligrams of sodium per serving is "disqualified" from making any health claims whatsoever, including heart-health claims.  *See* 21 C.F.R. § 101.14(a)(4).

46.    The AHA will certify products containing up to 480 milligrams of sodium per serving, even though that sodium content exceeds the AHA's own guidelines.

47.    A product with more than 480 milligrams of sodium per serving not only does not qualify for a "low sodium" claim (only products with 140 milligrams of sodium per serving or less qualify for that claim; *see* 21 C.F.R. § 101.61(b)(4)) but is actually considered so *high in sodium* that no other health benefits the product might possess can be described on the labeling. This level of sodium is so unhealthy that the FDA prohibits any and all health claims for those products.

48.    The AHA does not publicize the total dollar amount of revenues brought in through its Heart-Check Mark program, but indicates that manufacturers must pay (a) company application and set-up fees (between $1,500 and $7,500), (b) product application and certification fees for each individual product a company wants to certify (between $2,350 and $5,000 per product), and (c) annual per-product renewal fees to maintain the right to include the symbol on their product labeling and in marketing materials (between $2,350 and $5,000 per product).

49.    Campbell's has purchased AHA certification for at least 97 (ninety-seven) of its products, including soups, juices, breads, and sauces, and pays annual fees to maintain these products' certifications.  Each AHA-certified Campbell's product, including all varieties of

Healthy Request soup, displays an identical AHA Heart-Check Mark symbol on its product packaging.

50.     In recent years, the AHA has even expanded the Heart-Check Mark certification "brand" from prepackaged food products to encompass restaurant meals and even hospitals. Currently, the only restaurant that has received certification is Subway, which, perhaps not coincidentally, is also one of the AHA's biggest corporate donors.

51.     The AHA's aggressive promotion and expansion of its Heart-Check Mark certification program demonstrates how the AHA puts revenues ahead of fulfilling its mission.

52.     Indeed, former employees have voiced their disdain with the AHA's willingness to sacrifice its purported values and to abandon its mission when corporate donations are at stake – including but by no means limited to the fees and revenues associated with the Heart-Check Mark seal.

53.     One former AHA employee explained, "[t]he mission is secondary to the revenue. The top managers care more about getting their bonuses than saving lives."[1]  Many other former employees echo this point.

54.     For instance, another employee wrote, "[working at the AHA] is all about the 'bottom line' and [management] will use guilt or 'any means necessary' to get there.  It's not about the mission. …  [Management uses] [s]hady practices that are never officially put into

---

[1]     American Heart Association Employee Review, "Revenue over mission," February 23, 2013, *available at* http://www.glassdoor.com/Reviews/Employee-Review-American-Heart-Association-RVW2396822.htm.

writing, like the best practices, but are praised if it contributes to the bottom line."[2]  As a third former employee wrote, AHA is "[m]oney driven, not [m]ission driven."[3]

55.     According to a different former employee, "[u]pper management gets very cozy to big companies that can bring in a lot of funds, but ignores survivors and smaller companies that are more passionate about heart disease.  …  Fundraising is far more important than programming,"[4] while another wrote that, "[l]eadership's primary interest is in achieving their bonuses and keeping their jobs at any cost.  Satisfying the Board of Directors, corporate partners and big donors guides everything.  Science, programs and policies are driven [by] a handful of influential companies and doctors."[5]

56.     The Heart-Check Mark certification scheme is a stark illustration of the accounts given by former AHA employees.  While the AHA is, in accordance with its mission, advising consumers to avoid processed foods, including canned soups, with unhealthy amounts of sodium – defined by the AHA as any food product containing more than 140 milligrams of sodium per serving – it is simultaneously licensing its seal of approval, in exchange for corporate dollars, for use on labels of processed food products that far exceed that threshold.

---

[2]     American Heart Association Employee Review, "It's ran like a for-profit corporation, I feel deceived," May 9, 2012, *available at* http://www.glassdoor.com/Reviews/Employee-Review-American-Heart-Association-RVW1501447.htm

[3]     American Heart Association Employee Review, "It's all about the money!," October 29, 2011, *available at* http://www.glassdoor.com/Reviews/Employee-Review-American-Heart-Association-RVW1175615.htm

[4]     American Heart Association Employee Review, "Toxic corporation disguised as a nonprofit organization – too political and incompetent management," August 20, 2011, *available at* http://www.glassdoor.com/Reviews/Employee-Review-American-Heart-Association-RVW1071977.htm

[55]     American Heart Association Employee Review, "Talent crushing environment," April 2, 2012, *available at* http://www.indeed.com/cmp/American-Heart-Association/reviews?start=40&lang=en.

***The AHA's Heart-Check Mark Symbol Misleads Consumers – Especially Those With
Cardiovascular Ailments***

57.     Consumers rely on the AHA to provide dietary recommendations consistent with
its mission and with its general nutritional guidelines.  AHA and its corporate clients, however,
conceal from consumers the truth that the AHA employs a different – and far less stringent – set
of criteria when it certifies food products under its Heart-Check Mark certification program than
when it offers disinterested nutritional guidance.

58.     Indeed, the AHA actively promotes this misunderstanding and relies on it to sell
its seal of approval to manufacturers.  As the AHA tells manufacturers, "today, [the Heart-Check
Mark] stands as ***the most trusted*** (63 percent) and ***the most recognized*** (83 percent) health
symbol among food icons tested" in empirical research on shoppers' preferences.  AHA goes on,
"Shoppers ***rely on the Heart-Check Mark*** to make choosing heart-healthy products easy and
convenient.  And in September 2009, we learned that ***this brand awareness translates to
increased sales***."

59.     Specifically, the AHA tells manufacturers that adding the Heart-Check Mark to
their products can be expected to increase product sales by as much as five percent: "In-store
sales data revealed [in September 2009] that the Heart-Check Mark ***boosts incremental sales an
average of 5 percent*** when certified products were highlighted with a shelf hang-tag promotion
along with messages distributed at check out."

60.     The AHA's pitch to manufacturers is that shoppers want clear, simple purchase
guidance from a trusted source, and the AHA's symbol increases product sales because seeing
the mark on a package assures shoppers they are making a "smart choice."

61.     In fact, according to the AHA's research, 85% of shoppers find the mark on
packages "helpful" or "very helpful."   The Heart-Check Mark symbol increases by 75% the

likelihood that a shopper will purchase the product that bears the mark.  When faced with a choice of similar products, the Heart-Check Mark symbol positively influences 60% of shoppers' purchase decisions.  In such circumstances, consumers are purchasing the certified product over comparable, non-certified products *strictly because of* the presence of the symbol, which consumers reasonably but erroneously understand to signify compliance with the AHA's dietary and nutritional guidelines.

62.    Food manufacturers – and the AHA – know that many consumers have become much more health-conscious, and more sodium-conscious, as the connection between sodium intake and mortality has become clearer.

63.    In 2009, the Food Marketing Institute, a trade association that researches "consumer attitudes toward food safety," found that over 60% of consumers considered sodium levels or sodium labeling an important consideration when shopping.  Accordingly, consumers increasingly choose products labeled to indicate that they are heart healthy and low in sodium, such as products bearing the AHA Heart-Check Mark symbol.

64.    Market research published in 2012 confirms that finding.  The International Food Information Council Foundation ("IFICF"), a nonprofit food safety and nutrition foundation, found in its 2012 *Food & Health Survey* that 60% of consumers consider sodium levels important in making decisions about which packaged foods and beverages to purchase and consume.  The IFICF reports, "Six out of ten Americans consider the sodium content of packaged foods [in making purchasing decisions] – almost always due to a desire to limit or avoid it entirely."

65.    Campbell's capitalizes on consumers' health- and sodium-consciousness by charging a price premium for its AHA-certified Healthy Request soups.  Campbell's understands

that consumers will pay a premium for products that have low levels of sodium and are thus considered healthier than similar products with higher levels of sodium.

66.     American consumers' concern over their sodium intake is well-founded.  Most Americans already have high blood pressure or are at high risk for developing it, and approximately 90% of all Americans will develop hypertension over their lifetime.  (Vasan RS, *et al.*, "Residual lifetime risk for developing hypertension in middle-aged women and men," *Journal of the American Medical Association*, 2002; 287 (8): 1003-10.)

67.     According to the Centers for Disease Control and Prevention, however, approximately 90% of Americans consume more sodium than is recommended for a healthy diet. Each year over 800,000 people in the United States die from heart disease, stroke, or other vascular diseases.

68.     The Heart-Check Mark is particularly unfair and deceptive in light of the increasingly large number of consumers in the United States with heart disease, including congestive heart failure.

69.     Congestive heart failure is a disease where the heart becomes too weak (or too stiff) to adequately pump the blood forward into the circulation: blood from the left ventricle backs up into the lungs, making breathing difficult, and breathing while lying down flat virtually impossible.  Blood from the right ventricle backs up into the veins and causes swelling in the body (edema), especially in the feet and abdomen (the latter puts pressure on the liver and can cause cirrhosis).

70.     The AHA itself states that nearly 5.7 million Americans suffer from heart failure: it is responsible for more hospitalizations than all forms of cancer combined and is the number

one cause of hospitalization for Medicare patients.  (Dumitru I, *et al.*, "Heart failure," *Medscape*, available at emedicine.medscape.com/article/163062-overview/.)

71.   Indeed, according to a 2009 study in the *New England Journal of Medicine*, the rate of readmission during the six months following discharge after hospitalization for congestive heart failure may be as high as 50%.  (Jencks SF, *et al.*, "Rehospitalizations among patients in the Medicare fee-for-service program, *New England Journal of Medicine*, 2009;360(14): 1418-28.)  Approximately 277,000 Americans die from heart failure each year.  (Roger VL, *et al.*, "Heart disease and stroke statistics – 2011 update: a report from the American Heart Association," *Circulation*, 2011;123(4): e18-e209.)

72.   Dietary intake of sodium exacerbates heart failure by causing fluid retention, which increases the volume of plasma in the circulation, thus increasing the work the heart must do to pump.  According to one study, more than 65% of hospital admissions for heart failure exacerbation were caused by excess sodium consumption ("dietary indiscretion"), noncompliance with medications, or both.  (Ghali JK, *et al.*, "Precipitating factors leading to decompensation of heart failure," *Archives of Internal Medicine*, 1988; 148: 2013-2016; *see also* bestpractice.bmj.com/best-practice/monograph/62/diagnosis/step-by-step.html.)

73.   Campbell's placement of the AHA's Heart-Check Mark on its Healthy Request soup product labels, which intentionally communicates and conveys the AHA's purported endorsement of those products, deceives consumers, including without limitation people with heart failure, or at risk of heart failure, into thinking that these products actually adhere to the AHA's standards when, in fact, they do no such thing.  Rather, undisclosed to consumers is the fact that the AHA's Heart-Check Mark symbol merely denotes compliance with the FDA's minimum standards, which differ markedly from the AHA's own.

74.     Campbell's further knew that its misleading marketing of its Healthy Request soups as low in sodium and as having received the AHA Heart-Check Mark certification would enhance the perceived value of the product.  Accordingly, Campbell's knew that it could charge a premium for products uniformly marketed and labeled this way, in comparison with Campbell's other, non-certified products and in comparison with competitors' soups with comparable nutrient contents.

75.     During the Class Period, Campbell's charged such a premium for its Healthy Request soups, and stores that sold (and continue to sell) Campbell's Healthy Request brand soups charged consumers more for such soups than for either the company's regular soups without similar health claims, or competitors' soups with comparable nutrient contents.

76.     For example, Campbell's condensed Healthy Request soups cost $1.69 to $1.99 per unit, whereas Campbell's regular condensed soups, which are not certified by the AHA, cost as little as $0.79 per unit.  To take one instance, Campbell's condensed Healthy Request tomato soup (10.75 oz.) costs $1.99 per unit while Campbell's condensed regular tomato soup (10.75 oz.) costs $0.79 per unit.  Additionally, Wegmans' condensed tomato soup (10.75 oz.) costs $0.50 per unit.

77.     By prominently displaying the AHA Heart-Check Mark symbol on every Healthy Request product label, Campbell's ensured that every consumer would consider the certification in deciding whether the product warranted the higher price tag.

### Campbell's Misleadingly Markets Its Healthy Request Soups

78.     Campbell's runs a uniform nationwide marketing campaign that uniformly promotes its Healthy Request soup line in misleading ways.  This campaign includes product labeling, print advertisements, broadcast advertisements, and Internet websites, each of which

conveys a uniform, deceptive message to consumers about the heart-healthfulness and sodium content of its soups.

79.     The following image shows how Campbell's includes the AHA Heart-Check Mark symbol on its Healthy Request product labels:



80.     Campbell's uses its Healthy Request soup product labels and advertisements in print, broadcast, and Internet media to mislead consumers in not less than four ways.

81.     *First*, Campbell's placement of the Heart-Check Mark symbol on its Healthy Request soup product labels and advertisements misleadingly conveys to consumers that those products enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents, when, in fact, they do not.

82.      *Second*, Campbell's placement of the Heart-Check Mark on its Healthy Request soup product labels and advertisements misleadingly conveys to consumers that those products are in compliance with the AHA's general, non-commercial dietary and nutrition guidelines, when, in fact, they are not.

83.     *Third*, Campbell's placement of the Heart-Check Mark symbol on its Healthy Request soup product labels and advertisements misleadingly conveys to consumers that those products qualify under FDA regulations as low-sodium products, when, in fact, they do not.

84.     *Fourth*, in its advertisements for Healthy Request soup products, Campbell's uses language calculated to deceive consumers by suggesting that its Healthy Request soups are low in sodium, when, in fact, they are not.    In particular, in these widely-disseminated advertisements, Campbell's uses language such as "a healthy level of sodium," "lower sodium," and "controlled for sodium" to describe its Healthy Request soup products.

### Campbell's Healthy Request Soups Do Not Enjoy Cardiovascular Benefits Not Enjoyed By Competing, Non-Certified, Products

85.     The AHA's Heart-Check Mark seal of approval signifies to consumers that certified products possess heart-related benefits that similar products do not possess.

86.     A can of Campbell's Healthy Request soup prominently displaying the AHA's logo on the front and back of its packaging, when compared against a competing soup product with comparable nutrient contents which does not display the AHA's seal of approval but only a generic heart symbol, suggests to consumers that a difference in cardiovascular benefits exists between the two products.   For instance, Progresso markets a line of "Reduced Sodium" soups containing substantially the same nutrients as Campbell's Healthy Request soups, and which display a generic heart symbol and the words "heart healthy" on their labels.   The only meaningful difference between Campbell's Healthy Request soups and Progresso's "Reduced Sodium" soups is the presence or absence of the AHA's Heart-Check Mark symbol, which suggests that Campbell's products enjoy AHA-recognized cardiovascular benefits that Progresso's products do not.

87.     This is a false impression that is actively encouraged by the AHA and Campbell's, by exploiting the reputation for reliability, trustworthiness, and integrity that the AHA enjoys.

88.     Campbell's Healthy Request soups do not enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents.  The contrary message, which is asserted in the AHA's decision to certify Campbell's Healthy Request soups and in Campbell's placement of the identical AHA Heart-Check Mark symbol on all of its Healthy Request product labels, is false and misleading to consumers, including Plaintiff and the other members of the Class.

### Campbell's Healthy Request Soups Fail To Comply With The AHA's Dietary And Nutrition Guidelines

89.     As alleged above, the AHA advises consumers to eat less than 1,500 milligrams of sodium per day and to choose only low-sodium canned foods, defined by the AHA as foods containing 140 milligrams of sodium or less per serving.  This guidance is non-commercial and based on scientific and medical research.

90.     Every Healthy Request soup that Campbell's manufactures and markets contains 410 milligrams of sodium per serving.  Uncondensed or ready-to-eat Healthy Request soups (including the "Chunky," "100% Natural," and "Select Harvest" lines) contain two approximately eight-ounce servings, with 820 milligrams of sodium per unit.  Condensed Healthy Request soups (to which water or milk must be added before consumption) contain two and one-half servings of approximately four ounces, with 1,025 milligrams of sodium per unit.

91.     Therefore, a single serving of any Campbell's Healthy Request soup has nearly *three times* the amount of sodium permitted by the AHA's non-commercial dietary and nutrition guidelines.  A full can of any Healthy Request soup contains *six to seven times* the amount of sodium permitted by the AHA's guidelines.

92.     For these reasons, Campbell's Healthy Request soups do not comply with the AHA's non-commercial dietary and nutrition guidelines.  The contrary message, which is

24

asserted in the AHA's decision to certify Campbell's Healthy Request soups and in Campbell's placement of the identical AHA Heart-Check Mark symbol on all of its Healthy Request product labels, is false and misleading to consumers, including Plaintiff and the other members of the Class.

### Campbell's Healthy Request Soups Do Not Qualify As Low-Sodium Products Under FDA Regulations

93.     As described above, the FDA does not permit food product manufacturers to state that a product is low in sodium unless it contains 140 milligrams of sodium per serving or less.

94.     Because the AHA has adopted the FDA's low-sodium regulation as its own standard for low-sodium foods – and because the AHA advises consumers to eat only low-sodium canned soups – the presence of the Heart-Check Mark on Campbell's Healthy Request soups implies that such soups qualify as low-sodium foods under FDA regulations.

95.     Because Campbell's Healthy Request soups contain substantially more than 140 milligrams of sodium per serving, namely 410 milligrams of sodium per serving, it is not true that those soups qualify as low-sodium foods under FDA regulations.  The contrary message, which is asserted in the AHA's decision to certify Campbell's Healthy Request soups and in Campbell's placement of the identical AHA Heart-Check Mark symbol on all of its Healthy Request product labels, is false and misleading to consumers, including Plaintiff and the other members of the Class.

### Campbell's Makes Additional Misrepresentations About Its Healthy Request Soups In Its Print, Broadcast, And Internet Advertisements

96.     In addition to its uniform misrepresentations and/or omissions on its Healthy Request product labeling, Campbell's makes similar misrepresentations and/or omissions in print, broadcast, and Internet advertisements.

97.    In a magazine advertisement in *Better Homes & Gardens* printed in February 2009, which Plaintiff reviewed and considered in deciding to purchase Healthy Request soups, Campbell's represented: "Campbell's Healthy Request Soups – all 25 choices – have our **lower sodium** *natural sea salt* added for taste you can actually taste," and included in large print, "***Surprise, it's lower sodium***":





AD CODE: CAMPFB-1124     SOURCE: Better Homes and Gardens-FEB 1 09

98.    In a magazine advertisement in *Better Homes & Gardens* printed in September 2010, which Plaintiff reviewed and considered in deciding to purchase Healthy Request soups, Campbell's prominently displayed the Heart-Check Mark symbol and represented: "Campbell's Healthy Request Soup … **healthy levels of sodium**" that should be "a heartwarming part of your heart-healthy diet!":



AD CODE: CAMPFB-1521     SOURCE: Better Homes and Gardens-SEP 1 10

99.     Campbell's employs the same misleading language, and the same misleading use of the Heart-Check Mark symbol, in another print ad that ran in *People* magazine from December 6, 2010 to March 2011, which Plaintiff reviewed and considered in deciding to purchase Healthy Request soups.  The ad reads, "Going Heart Healthy? Two Hearts Are Better Than One.  …  25 Heart Healthy Soups – Low Cholesterol – 0 Grams Trans Fat – ***Healthy Levels of Sodium***":





AD CODE: CAMPFB-1724     SOURCE: People-DEC 6 10

100.    In a television commercial that ran nationwide from September 20, 2010 to March

28, 2011, Campbell's asserted:  "Everyone has someone to go heart healthy for.  Who is your

someone?  Eating Campbell's Healthy Request can help.  Low cholesterol, zero grams trans-fat,

and a ***healthy level of sodium***.  It's amazing what soup can do."  The ad appeared on popular

cable networks including: AMC, ABC Family, BRAVO, CNN, Fox News Channel, Food

Network, Hallmark Channel, Lifetime, MSMBC, Nickelodeon, Oxygen, TBS, TLC, TNT, The

Weather Channel and many others.  It was featured during programs that focused on health and cooking such as "30 Minute Meals with Rachael Ray."   A similar commercial also ran nationwide on those cable networks from September 20, 2010 to February 4, 2011.

101.   Further, on its Internet website, which Plaintiff reviewed and considered in deciding to purchase Healthy Request soups, Campbell's states that Healthy Request soups have been "controlled for sodium."   Importantly, this language appears in Campbell's description of the **health benefits** of Healthy Request soups, leading consumers to believe that "controlled for sodium" means "low in sodium":



102.   Campbell's Healthy Request Internet website also prominently displays the AHA Heart-Check Mark.

103.   Campbell's designed its print, broadcast, and Internet representations about the sodium in its Healthy Request soups to uniformly convey the message that those soups are in the same family of products with the following representations: "low sodium," "little sodium," "low in sodium," "low source of sodium," "contains a small amount of sodium."

104.    Campbell's intended to create this confusion and misperception, and the phrasing used by Campbell's to promote its Healthy Request soup products was designed to be, was, and remains deceptive and misleading.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a nationwide class (the "Class") defined as:

> All individuals in the United States who purchased any Campbell's "Healthy Request" soup bearing an AHA Heart-Check Mark symbol on its label.

Excluded from the Class are AHA and its subsidiaries and affiliates; Campbell's and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; all claims for wrongful death, survivorship, and/or personal injury by Class members; governmental entities; and the judges to whom this case is assigned and their immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

106.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

107.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**    The members of the Class are so numerous that individual joinder of all the members is impracticable.    On information and belief, there are not less than tens of thousands of consumers who have been damaged by the AHA's and Campbell's wrongful conduct as alleged herein.    The precise number of Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from Campbell's books and records.    Class members may be notified of the

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

108.    **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.      Whether Campbell's Healthy Request soup products bearing the AHA Heart-Check Mark symbol on their labels mislead consumers by suggesting that those products are in compliance with AHA's general dietary and nutrition guidelines;

b.      Whether Campbell's Healthy Request soup products bearing the AHA Heart-Check Mark symbol on their labels mislead consumers by suggesting that those products enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents;

c.      Whether Campbell's Healthy Request soup products bearing the AHA Heart-Check Mark symbol on their labels misleads consumers by suggesting that those products are low in sodium;

d.      Whether the AHA's certification of Campbell Healthy Request soup products allows the AHA to profit from the deceptive use of the Heart-Check Mark symbol by Campbell's on the labels for such products;

e.      Whether Campbell's use of the Heart-Check Mark symbol on the labels for Healthy Request soup products allows Campbell's to profit from the use of that symbol;

f.      Whether Campbell's use of the AHA Heart-Check Mark in its advertising and marketing materials for its Healthy Request soup products, other than product labeling, misleads consumers by suggesting that those products are in compliance with AHA's general dietary and nutrition guidelines;

g.      Whether Campbell's use of the AHA Heart-Check Mark in its advertising and marketing materials for its Healthy Request soup products, other than product labeling, misleads consumers by suggesting that those products enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents;

h.      Whether Campbell's use of "controlled for sodium," "healthy levels of sodium," and "lower sodium" in its advertising and marketing materials for its Healthy Request soup products, other than product labeling, misleads consumers by suggesting that those products are low in sodium;

i.      Whether AHA's and Campbell's conduct constitutes unfair, illegal, deceptive and/or fraudulent business practices; and

j.      Whether Plaintiff and the other Class members are entitled to relief, and the nature of such relief.

109.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the claims of other Class members because, among other things, all Class members were comparably injured through the uniform misconduct described above.

110.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members she seeks to represent; she has retained counsel competent

and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously.   Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

111.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** The AHA and Campbell's have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

112.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the AHA and Campbell's, so it would be impracticable for Class members to individually seek redress for the AHA's and Campbell's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### COUNT I
**(Violation of New Jersey Consumer Fraud Act)**

113.   Plaintiff incorporates by reference all allegations of Paragraphs 1-112 as though fully set forth herein.

114.    This Count is brought by Plaintiff individually and on behalf of all other Class members.

115.    AHA's and Campbell's practices were and are in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*.  The New Jersey Consumer Fraud Act prohibits "[t]he act, use or employment by any person of any unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise," including any sale or any distribution of services.

116.    Defendants, as corporations, are "persons" within the meaning of the New Jersey Consumer Fraud Act, and are accordingly prohibited from engaging in unconscionable business practices and deceptive acts.

117.    As alleged herein, during the Class Period, AHA and Campbell's engaged in a common plan and scheme through the use of uniform misleading statements, misrepresentations, and omissions on product labels, advertisements, and websites to induce consumers to purchase higher-priced versions of Campbell's products.  The New Jersey Consumer Fraud Act applies nationally because AHA's and Campbell's deceptive marketing campaign was uniform and consistent across all fifty States.

118.    As alleged herein, AHA's and Campbell's marketing practices constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of merchandise.

119.    Defendants' business practices as alleged hereinabove were designed to and did create an impression that is misleading and deceptive to the average and ordinary consumer.

120.    As alleged herein, Campbell's practice of inserting on Healthy Request soup product labels the AHA Heart-Check Mark symbol serves to convey to consumers the message that the products (a) are in compliance with AHA's general dietary and nutrition guidelines, (b) enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents, and (c) qualify as low-sodium products, and thus misleads consumers in connection with the sale of merchandise.

121.    As alleged herein, Campbell's practice of inserting in advertising and marketing materials for its Healthy Request soup products, including print advertisements, broadcast advertisements, and websites, the AHA Heart-Check Mark symbol serves to convey to consumers the message that the products (a) are in compliance with AHA's general dietary and nutrition guidelines, (b) enjoy cardiovascular benefits not enjoyed by competing non-certified products with comparable nutrient contents, and (c) qualify as low-sodium products, and thus misleads consumers in connection with the sale of merchandise.

122.    As alleged herein, Campbell's practice of inserting in advertising and marketing materials for its Healthy Request soup products, including print advertisements, broadcast advertisements, and websites, language including, "controlled for sodium," "healthy level of sodium," and "lower sodium," serves to convey to consumers the message that the products qualify as low-sodium products, and thus misleads consumers in connection with the sale of merchandise.

123.    According to AHA's guidelines, and in conformity with FDA regulations, a low-sodium product contains no more than 140 milligrams of sodium per serving.   AHA emphatically advises and instructs consumers to choose low sodium foods, *i.e.*, foods containing 140 milligrams or less of sodium per serving.

124.   By certifying products containing more than 140 milligrams of sodium per serving, AHA knowingly deceives consumers for its own benefit and for the benefit of the food manufacturers and distributors, including Campbell's, which profit from the misunderstanding purposefully created by the AHA.  AHA benefits from this comprehensive scheme by charging annual per-product fees for certification as well as by attracting donations from corporations, including Campbell's, that market their products by using the AHA Heart-Check Mark symbol. As such, AHA's and Campbell's business practices are deceptive and unconscionable.

125.   As a result of Defendants' misrepresentations and omissions alleged herein, Plaintiff and the other Class members overpaid for the AHA-certified and AHA-labeled Healthy Request soup products they purchased during the Class Period because the value of paying more for AHA-certified and AHA-labeled products because of their claimed health benefits was illusory.

126.   Defendants' misrepresentations and omissions alleged herein caused Plaintiff and the other Class members to make their purchases of AHA-certified and AHA-labeled Healthy Request soup products marketed by Campbell's.   Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased these products, would not have purchased these products at the prices listed, and/or would have purchased less expensive alternatives to those products that did not contain the AHA Heart-Check Mark symbol, and which were not marketed as being "controlled for sodium," containing a "healthy level of sodium," or "lower sodium."

127.   Accordingly, Plaintiff and the other Class members have suffered ascertainable losses as a result of being improperly induced to purchase the AHA-certified and AHA-labeled Healthy Request soup products, to pay more for the AHA-certified and AHA-labeled Healthy

Request soup products than Plaintiff and other Class members would have paid for the products absent Defendants' misrepresentations, and/or to pay more for the AHA-certified and AHA-labeled Healthy Request soup products than less expensive alternatives to those products that did not contain the AHA Heart-Check Mark symbol, and which were not marketed as being "controlled for sodium," containing a "healthy level of sodium," or "lower sodium," during the Class Period.

128.    By virtue of their purchases, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT II
### (Breach of Express Warranty)

129.    Plaintiff incorporates by reference all allegations of Paragraphs 1-128 as though fully set forth herein.

130.    This Count is brought by Plaintiff individually and on behalf of all other Class members.

131.    Campbell's, by conducting a uniform nationwide marketing campaign for its Healthy Request soup products based on the AHA's certification of those products, expressly warranted that those products would (a) comply with the AHA's general dietary and nutrition guidelines, (b) possess cardiovascular benefits not possessed by competing non-certified products with comparable nutrient contents, and (c) qualify as low-sodium foods.  Campbell's Healthy Request soup products are, in fact, noncompliant with the AHA's general dietary and nutrition guidelines, possess no cardiovascular benefits not possessed by competing non-certified products with comparable nutrient contents, and do not qualify as low-sodium foods.

132.    Campbell's express warranties, whether on product labeling or in advertising and other marketing materials for Campbell's Healthy Request soup products, became part of the

basis of the bargain between Plaintiff and other Class members on one hand and Campbell's on the other.

133.     Campbell's knew or should have known throughout the Class Period that the Healthy Request soup products failed to comply with the AHA's general dietary and nutrition guidelines, possessed no cardiovascular benefits not possessed by competing non-certified products with comparable nutrient contents, and did not qualify as low-sodium foods.

134.     Campbell's breached its express warranties to Plaintiff and other Class members by failing to provide a product conforming to its labeled and advertised characteristics, as described above.

135.     Plaintiff and the other Class members were injured as a direct and proximate result of Campbell's breach, by being improperly induced to purchase the AHA-certified and AHA-labeled Healthy Request soup products, to pay more for the AHA-certified and AHA-labeled Healthy Request soup products than Plaintiff and other Class members would have paid for the products absent Defendants' misrepresentations, and/or to pay more for the AHA-certified and AHA-labeled Healthy Request soup products than less expensive alternatives to those products that did not contain the AHA Heart-Check Mark symbol, and which were not marketed as being "controlled for sodium," containing a "healthy level of sodium," or "lower sodium," during the Class Period.

## **COUNT III**
### **(Unjust Enrichment)**

136.     Plaintiff incorporates by reference all allegations of Paragraphs 1-135 as though fully set forth herein.

137.     This Count is brought by Plaintiff individually and on behalf of all other Class members.

138.    When Campbell's represented its Healthy Request soup products as being compliant with the AHA's general dietary and nutrition guidelines, in possession of cardiovascular benefits not possessed by competing non-certified products with comparable nutrient contents, and qualifying as low-sodium products, it knew these representations were false and/or lacked a reasonable basis for believing those representations to be true.

139.    As a result of its wrongful acts and omissions, as set forth above, Campbell's charged a higher price for its Healthy Request soup products than the products' true value, and Campbell's obtained monies that rightfully belong to Plaintiff and the other Class members.

140.    Campbell's accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members, who without knowledge of the falsity of the misrepresentations and omissions regarding the Healthy Request soup products paid a price for those products in excess of their true value.  It would be inequitable and unjust for Campbell's to retain these wrongfully obtained profits.

141.    Plaintiff and the Class members are therefore entitled to restitution in an amount to be determined at trial.

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in her favor and against Defendants AHA and Campbell's, as follows:

A.      Declaring that this action is a proper class action, certifying the Class as described above, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B.      Enjoining Defendants from continuing the unfair, deceptive, and misleading business practices alleged in this Complaint;

C.       Ordering Defendants to pay actual damages, plus treble damages pursuant to N.J.S.A. 56:8-19, to Plaintiff and the other Class members, as allowable by law;

D.       Ordering Defendants to pay restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and the other Class members;

E.       Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F.       Ordering Defendants to pay attorney fees and costs of suit; and

G.       Ordering such other and further relief as may be just and proper.

<div style="margin-left:50%">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Counsel for Plaintiff


By:    /s/ James E. Cecchi
        JAMES E. CECCHI

</div>

Dated: August 13, 2013

Jay W. Eisenhofer                          Adam J. Levitt
GRANT & EISENHOFER P.A.      GRANT & EISENHOFER P.A.
485 Lexington Avenue                   30 North LaSalle Street, Suite 1200
New York, New York  10017        Chicago, Illinois  60602
(646) 722-8500                              (312) 214-0000

Reuben A. Guttman                      Kyle J. McGee
GRANT & EISENHOFER P.A.      GRANT & EISENHOFER P.A.
1920 L Street NW, Suite 400          123 Justison Street
Washington, DC  20036                 Wilmington, Delaware  19801
(202) 386-9500                              (302) 622-7000

                                                  Sergei Lemberg
                                                  LEMBERG & ASSOCIATES LLC
                                                  1100 Summer Street
                                                  Stamford, Connecticut  06905
                                                  (203) 653-2250

*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

<div style="text-align:right">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Counsel for Plaintiff


By:    <u>/s/ James E. Cecchi</u>
     JAMES E. CECCHI

</div>

Dated: August 13, 2013

Jay W. Eisenhofer
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York  10017
(646) 722-8500

Reuben A. Guttman
GRANT & EISENHOFER P.A.
1920 L Street NW, Suite 400
Washington, DC  20036
(202) 386-9500

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
(312) 214-0000

Kyle J. McGee
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware  19801
(302) 622-7000

Sergei Lemberg
LEMBERG & ASSOCIATES LLC
1100 Summer Street
Stamford, Connecticut  06905
(203) 653-2250

***Counsel for Plaintiff***