## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KERRY O'SHEA, on behalf of herself and all others similarly situated; | Consolidated Civil Action No.: 1:13-cv-04887-RMB-KMW |
| JAMES WALDRON, on behalf of himself and all others similarly situated; | |
| TIMOTHY POWERS, on behalf of himself and all others similarly situated, | |
|          Plaintiffs, | |
| v. | |
| CAMPBELL SOUP COMPANY and AMERICAN HEART ASSOCIATION, INC., | |
|          Defendants. | |

## <u>MEMORANDUM IN SUPPORT OF THE AMERICAN HEART ASSOCIATION'S MOTION TO DISMISS</u>

Bert W. Rein, Esquire
**WILEY REIN LLP**
1776 K Street, NW
Washington, DC  20006
(202) 719-7000
BRein@wileyrein.com

Michael J. Vassalotti, Esquire
**BROWN & CONNERY, LLP**
360 Haddon Avenue - P.O. Box 539
Westmont, New Jersey 08108
(856) 854-8900
mvassalotti@brownconnery.com

*Attorneys for Defendant American Heart Association, Inc.*

**TABLE OF CONTENTS**

                                                                                     Page

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND OF THIS ACTION ........................................................ 5

III.    O'SHEA, A CALIFORNIA RESIDENT, AND POWERS, AN INDIANA,
        RESIDENT CANNOT BRING CLAIMS UNDER THE NJCFA .................. 6

        A.      O'Shea Cannot Bring a Claim Under the NJCFA Because She is a California
                Purchaser .................................................................................... 7

        B.      Powers Cannot Bring a Claim Under the NJFCA Because He is an Indiana
                Purchaser. ................................................................................. 10

        C.      The Court Should Dismiss O'Shea's and Powers's NJCFA Claims ............... 11

IV.     THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE ANY CLAIM AGAINST AHA
        UNDER THE NJCFA ............................................................................ 12

        A.      The *Twombly/Iqbal* Standard ............................................... 12

        B.      Plaintiffs Fail to State a Claim Against AHA Under the NJCFA ....................... 14

                1.      Plaintiffs Have Not Alleged An Unlawful Practice By AHA. .............. 16

                        a.      The Facts Alleged Do Not Support A Claim For Consumer
                                Deception By AHA ................................................ 16

                        b.      The Facts Alleged Do Not Support A Knowing Omission By
                                AHA .................................................................... 22

                2.      The Facts Alleged Do Not Support An Ascertainable Loss. ............... 24

                3.      Plaintiffs Have Not Alleged A Causal Nexus Between An Unlawful
                        Practice By AHA And An Ascertainable Loss. ............................ 26

        C.      Plaintiffs May Not Pursue Their Disagreement With AHA's Heart-Check
                Standards Through A NJCFA Action. .......................................... 27

V.      POWERS FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AS TO
        AHA ................................................................................................. 29

VI.     CONCLUSION ................................................................................... 31

i

## TABLE OF AUTHORITIES

Page

### Federal Cases

*Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496 (D.N.J. 2006) ..................16, 17, 22

*Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167 (3d Cir. 2011)..........................................................10

*Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282 (D.N.J. 2009)...........................17, 19, 22, 25

*Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691 (D.N.J. 2011) ...............................9, 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................................................13, 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2006)...................................................................13

*Cheerios Marketing & Sales Practices Litig.*, No. 09-2413, 2012 WL 3952069 (D.N.J. Sept. 10, 2012)....................................................................................................................................30

*Cooper v. Samsung Elecs. Am., Inc.*, 374 Fed. App'x 250 (3d Cir. 2010)..............................12

*Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494 (D.N.J. 2012) .....13, 26

*Donarchy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007 (D.N.J. 2012) ........13

*FDIC v. Bathgate*, 27 F.3d 850 (3d Cir. 1994)..................................................................13

*Feldman v. Mercedes-Benz*, No. 11-984, 2012 WL 6596830 (D.N.J. Dec. 18, 2012)...............7, 12

*Franulovic v. Coca Cola Co.*, No. 07-539, 2007 WL 3166953 (D.N.J. Oct. 25, 2007).........25, 26

*Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007) .............................................13, 14, 16

*Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112 (S.D. Ind. 2011) .........................................31

*Hand Promotions, Inc. v. Mills*, 567 F. Supp. 2d 719 (D.N.J. 2008) .....................................14

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002)...........................................11

*Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc.*, 736 F.Supp. 587 (D.N.J. 1990).......16, 17

*Klein v. DePuy, Inc.*, 506 F.3d 553 (7th Cir. 2002)..................................................................11

*Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529 (D.N.J. 2012)...............23

*Maniscalco v. Bro. Int'l Corp. (USA)*, 793 F. Supp. 2d 696 (D.N.J. 2011) ....................7, 8, 9, 12

*Mason v. Coca-Cola Co.*, No. 09-220, 2010 WL 2674445
   (D.N.J. Mar. 23, 2011)..............................................................................16, 19, 22, 29, 30

*McKinnis v. Gen. Mills, Inc.*, No. 07-2521, 2007 WL 4762172 (C.D. Cal. Sept. 18, 2007).........19

*MDNet v. Pharmacia Corp.*, 147 F. App'x 239 (3d Cir. 2005) ...............................................13

*Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009)................................7, 9, 12

*Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439 (D.N.J. 2012) ...........................................7, 9

*Nikolin v. Samsung Elecs. Am., Inc.*, No. 10-1456, 2010 WL 4116997 (D.N.J. Oct. 18, 2010).....9

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 2010)..........22

*Philips/Magnavox Television Litig.*, No. 09-3072, 2010 WL 3522787 (D.N.J. Sept. 1, 2010) ......9

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ..................................................12

*Samsung DLP Television Class Action Litig.*, No. 07-2141, 2009 WL 3584352 (D.N.J. Oct. 27, 2009)......................................................................................................................................12

*Simon v. United States*, 341 F.3d 193 (3d. Cir. 2003) .........................................................10, 11

*Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84 (D.N.J. 2011 ....................................21, 24, 25

*Solo v. Bed Bath & Beyond, Inc.*, No. 06-1908, 2007 WL 1237825 (D.N.J. Apr. 26, 2007)........26

*Stewart v. Smart Balance, Inc.*, No. 11-6174, 2012 WL 4168584 (D.N.J. June 26, 2012).....20, 22

*Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) .........................................13

*Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, No. 08-1057, 2008 WL 5381227 (D.N.J. Dec. 17, 2008)...............................................................................................................................23

*Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*, No. 08–939, 2009 WL 2940081

ii

(D.N.J. 2009) ................................................................................................ 17

*Viking Yacht Co., Inc. v. Composite One LLC*, 385 F. App'x 195 (3d Cir. 2010)........................ 17

*Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, No. 08-5380, 2010 WL 1424014
    (D.N.J. Apr. 8, 2010) .................................................................................... 9

*Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, 2010 WL 1424014 (D.N.J. May 27,
    2011) .................................................................................................... 12

*Weske v. Samsung Elecs. Am., Inc.*, 10-4811, 2012 WL 833003 (D.N.J. Mar. 12, 2012) ............ 9

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) .......................................... 20

## State Cases

*Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157 (Ind. 2002)........................... 10, 11

*Bosland v. Warnock Dodge Inc.*, 964 A.2d 741 (N.J. 2009) ...................................... 14

*Castro v. NYT Television*, 851 A.2d 88 (N.J. Super. Ct. App. Div. 2004) ........................ 15

*Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 839 A.2d 942 (N.J. Super. Ct. Law Div. 2003)24

*DepoLink Court Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579 (N.J. Super. Ct.
    App. Div. 2013) .......................................................................................... 14

*Gupta v. Asha Enters., L.L.C.*, 27 A.3d 953 (N.J. Super. Ct. App. Div. 2011) ........................ 16

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*,
    929 A.2d 1076 (N.J. 2007) ............................................................................ 26, 31

*Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071 (Ind. 1987)................................ 10

*Leon v. Rite Aid Corp.*, 774 A.2d 674 (N.J. Sup. Ct. App. Div. 2001) ........................... 22

*Romano v. Galaxy Toyota*, 945 A.2d 49 (N.J. Super. Ct. App. Div. 2008) .......................... 25

*Smith v. Alza Corp.*, 948 A.2d 686 (N.J. Sup. Ct. 2008) ............................................ 9

*Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417 (N.J. 1995). .................. 16

*Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807 (N.J. Super. Ct. App. Div. 2000)............. 26

*Wendling v. Pfizer, Inc.*, 2008 WL 833549 (N.J. Super. Ct. App. Div. 2008) ......................... 16

*Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213 (Ind. 2009) ........................ 29

## Rules, Statutes, Treatises & Regulations

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 5, 12

Fed. R. Civ. P. 9(b)........................................................................... 13

N.J.S.A. § 56:8-2 .............................................................................. 14, 16

N.J.S.A. § 56:8-19 ............................................................................ 14

Restatement (Second) of Conflict of Laws § 148.......................................... 8

21 C.F.R. § 101.9(c)(4)....................................................................... 18

iii

## I.   <u>PRELIMINARY STATEMENT</u>

Defendant American Heart Association, Inc. ("AHA") files this brief in support of its motion to dismiss all Counts against it pursuant to Fed. R. Civ. P. 12(b)(6). AHA is a non-profit charitable organization dedicated to helping people build healthier lives, free of cardiovascular diseases and stroke. AHA's Heart-Check Food Certification program, at issue in this case, advances that goal by certifying food products that meet AHA-specific nutrient criteria— including limitations on total fat, saturated and trans fats, cholesterol, and sodium—that AHA makes available to the public through its website and literature. The Heart-Check Food Certification program is intended, in part, to help bridge the gap between Americans' current dietary patterns and AHA's general, aspirational nutritional guidance by helping consumers identify foods that can be incorporated into a heart-healthy diet. It accomplishes this goal both by directly assisting consumers in making food choices, and by providing an incentive to food producers to make their products healthier. AHA has always maintained that selection of Heart-Check-certified products is only one element of an overall heart health-conscious approach to dietary choices. Because its Heart-Check Food Certification program is designed to be a consumer resource, AHA operates the program on a cost-neutral basis for the benefit of consumers and recovers from manufacturers seeking Heart-Check certification only the costs of administering the Heart-Check Food Certification program.

Plaintiffs Kerry O'Shea, a California resident, James Waldron, a New Jersey resident, and Timothy Powers, an Indiana resident, each seeking to act on behalf of a putative nationwide consumer class, allege that AHA violated the New Jersey Consumer Fraud Act ("NJCFA") when it licensed the Heart-Check Mark to Defendant Campbell Soup Company ("Campbell") for use in the labeling and advertising of Campbell's Healthy Request soups. According to the Complaints, which are substantively identical in every material respect, Campbell's use of the

Heart-Check Mark makes consumers believe—incorrectly—that Healthy Request soups are "low sodium" products as United States Food and Drug Administration ("FDA") regulations define that specific term, meaning that they contain a maximum of 140 mg. of sodium per recommended single serving.  Plaintiffs point to: (1) Campbell's advertising statement that the soups are "heart healthy" and contain "lower sodium," and (2) AHA's general nutritional guidance that advises consumers to limit sodium intake by choosing, where possible, "low sodium" and no-salt-added products.  According to Plaintiffs, the Heart-Check Mark also implies that Healthy Request soups are nutritionally superior to other soups with equivalent nutritional characteristics.

There are several fatal gaps in Plaintiffs' theory and factual allegations.  First, Plaintiffs fail to set forth any actual statements or actions on AHA's part that would plausibly support a reasonable consumer's perception that Healthy Request soups bearing the AHA Heart-Check Mark are "low sodium."  They do not—and cannot—allege that the FDA-regulated term of art "low sodium" is used: (1) in the Heart-Check Mark itself; (2) as the Heart-Check sodium criterion; or (3) in Campbell's advertising or labeling of Healthy Request soups.  Plaintiffs also fail to identify any advertising or labeling statement that states or implies that the Heart-Check Mark is licensed for only "low sodium" foods.  Nor do they attempt to bridge the obvious gap between AHA's and Campbell's actions and the supposed "low sodium" message received by the reasonable consumer.  Plaintiffs recite a series of unrelated statements by Campbell and AHA in various settings, but they do not and cannot credibly allege that they had or that a reasonable consumer would have knowledge of AHA's supposed "low sodium" guidance.  Nor do they allege that even if a reasonable consumer would know about AHA's preference for "low sodium" products (but be unaware of the Heart-Check certification criteria), that consumer

would understand it to be a requirement applicable to every product bearing the AHA Heart-Check Mark. Moreover, no pleaded Campbell's statement relating to "lower sodium" can be construed reasonably as a claim that the soup contains less than 140 mg. of sodium per serving.

Second, Plaintiffs do not—and cannot—allege that Healthy Request soups fail to meet the AHA's published criteria for Heart-Check Food Certification of soups. As clearly and publicly stated on AHA's Heart-Check website, these science-based nutrition criteria require that a soup manufacturer seeking Heart-Check certification verify its restricted total fat, saturated and trans fats, and cholesterol levels; contain a minimum of beneficial nutrients; and not exceed the 480 mg. per- standardized serving sodium level that FDA has established as the sodium limitation necessary to claim that a food is "healthy." Consistent with both FDA and Heart-Check criteria, Campbell's advertising and labeling accurately emphasize Healthy Request soups' limited fat and cholesterol content as well as their Vitamin A content.

Third, Plaintiffs do not—and cannot—allege that Campbell's advertising or labeling actually addresses or specifically claims superiority to any competing product. Nor do Plaintiffs point to any statement by AHA that states that competing products might not qualify for the Heart-Check Mark if submitted for review or compares the relative heart health benefit of competing, nutritionally similar, products.

And most fundamentally, Plaintiffs' claims would fail even if they had alleged all of these absent facts because the claims' premise—that a "reasonable" consumer would be deceived—simply is not plausible as a matter of law. Plaintiffs recognize, as they must, that the actual sodium content per serving of Campbell's Healthy Request soups is displayed on the cans' labels (sometimes more than once), and that AHA's Heart-Check Food Certification criteria are freely available on AHA's website. Thus, to construct their case of unlawful deception,

Plaintiffs are forced to conjure up a mythical "reasonable consumer" who is sufficiently concerned about sodium intake to (1) study AHA's general nutritional guidance and discover that AHA advocates consumption of "low sodium" products, and (2) know that "low sodium" products contain a maximum of 140 mg. of sodium per recommended serving; but despite that sophistication (3) believes the Heart-Check Mark on a label denotes a "low sodium" food without verifying that belief against the very same product label or reviewing AHA's actual Heart-Check criteria; and (4) pays a premium for Healthy Request products versus other, nutritionally similar soup products because those products do not participate in the Heart-Check Food Certification program.

To describe such a consumer as "reasonable" suffices to discredit it as a legal standard. Plaintiffs cannot have it both ways. If the "reasonable" consumer of Healthy Request soups is a careful, sophisticated buyer actually aware of sodium health issues, AHA's "noncommercial" nutritional guidance, and FDA sodium regulatory standards, then she also will have read Campbell's labels and been familiar with AHA's Heart-Check criteria and made a purchasing decision based on actual sodium content as accurately labeled, and would not be misled. But if the "reasonable" consumer of Healthy Request soups has no specific frame of reference for sodium content and thus relied solely on the Heart-Check Mark to make a purchasing decision, she would have had no basis for imputing any "low sodium" standard to the mark, and would not be misled. Either way, Plaintiffs' Complaints are fatally flawed.

Finally, Plaintiffs' failure to assert any additional cost to consumers as a result of this so-called deception, or to present any basis for concluding that such additional cost is attributable to a "low sodium" claim as opposed to Healthy Request soups' other superior nutritional

characteristics, further demonstrates the futility of both the NJCFA claim all Plaintiffs pursue and the unjust enrichment claim only Powers pursues.

Fundamentally, Plaintiffs express a preference for "low sodium" products, take issue with the sodium criterion of AHA's Heart-Check Food Certification program for soups, and cobble together statements made by Defendants in different settings, all in an attempt to weave a tale of deception. But a policy disagreement is not cognizable under the NJCFA or any other theory set forth in the Plaintiffs' respective Complaints. Because Plaintiffs' claims against AHA cannot succeed, they must be dismissed.

## II.    BACKGROUND OF THIS ACTION

Plaintiffs allege that they are consumers who purchased Campbell's Healthy Request soups at various locations in California (O'Shea), New Jersey (Waldron), and Indiana (Powers). O'Shea Compl. ¶¶ 15–16; Waldron Compl. ¶¶ 15–16; Powers FAC ¶¶ 13-15.[1]  Plaintiffs allege familiarity with what they refer to as AHA's "noncommercial" nutritional guidance, which advises consumers optimally to aim to achieve a sodium intake of no more than 1500 mg. per day and to look for no-salt-added and "low sodium" foods to help them achieve this level. Compl. ¶¶ 25, 37, 89. Plaintiffs further allege that they observed the AHA Heart-Check Mark on Healthy Request labeling, Compl. ¶ 17, considered statements made in particular Campbell advertisements, ¶ 18, and purchased Healthy Request soups—which contain 410 mg. of sodium per serving—believing that they "were low sodium products that conformed to AHA's dietary and nutritional guidelines and possessed cardiovascular benefits not enjoyed by competing

---

[1] Because the substantive allegations in each of the cases are identical, all statements of fact in this memorandum are drawn from the Complaint of Kerry O'Shea, Dkt. 1, No. 1:13-cv-04887-RMB-KMW (Aug. 13, 2013), except where otherwise noted. While AHA disputes many of Plaintiffs' factual assertions, because of the well-established Rule 12(b)(6) standards AHA has accepted them as true and cited them herein as they are set forth in the Complaints.

products not certified by AHA." Compl. ¶¶ 17-18, 27, 90.  Plaintiffs also allege that they paid more to retailers for Healthy Request soups than they would have paid for conventional soups. Compl. ¶¶ 65, 74, 76.

Based on these allegations, Plaintiffs have asserted a claim against AHA under the NJCFA.  Compl. ¶¶ 113–28.  Plaintiffs claim that they believed that the Heart-Check Mark communicated that the food bearing the mark conformed to the stringent guidance that AHA has created for heart-healthy eating, when in fact it is reviewed under separate criteria that AHA "concealed" from the public.  Compl. ¶ 57.  On that conclusory premise, Plaintiffs argue that they were misled in two basic ways: (1) the use of the Heart-Check Mark conveys to consumers that certified products are "low sodium" products, when they are not, Compl. ¶¶ 73, 82-83, 89-92, 120-21, 124; and (2) the use of the Heart-Check Mark conveys to consumers that certified products enjoy cardiovascular benefits not available from competing non-certified products with comparable nutrient content, when, in fact, they do not, Compl. ¶¶ 81, 83, 120–21.

Additionally, Powers alone has alleged that AHA was unjustly enriched at his expense (and the expense of other members of the putative class).  Powers FAC ¶¶ 141-146.  On that conclusory premise, Powers asks that the Court order restitution of the amount AHA unlawfully retained.  *Id.* ¶ 146.[2]

### III.   O'SHEA, A CALIFORNIA RESIDENT, AND POWERS, AN INDIANA RESIDENT, CANNOT BRING CLAIMS UNDER THE NJCFA

As described below, *see infra* Part IV, Plaintiffs' allegations do not state a claim under the NJCFA at all.  But as a preliminary matter, the court should simplify the case by dismissing

---

[2] The Plaintiffs are pursuing additional claims against Campbell.  All three Plaintiffs are pursuing a claim for breach of express warranty against Campbell but not AHA.  Powers is pursuing a claim for breach of implied warranty against Campbell but not AHA.  And Plaintiffs O'Shea and Waldron are pursuing an unjust enrichment claim against Campbell but not AHA.

outright the NJCFA claims improperly brought by the two out-of-state plaintiffs. Count I of O'Shea's Complaint and Count IV of Powers's Complaint allege that Campbell and AHA have violated the NJCFA by using "misleading statements, misrepresentations, and omissions on product labels, advertisements, and websites to induce consumers to purchase higher-priced versions of Campbell's products." O'Shea Compl. ¶¶ 115, 117; Powers FAC ¶¶ 159, 162. Under New Jersey choice-of-law rules, it is established by the pleaded facts that neither O'Shea nor Powers can bring a claim under the NJCFA. Dismissal of O'Shea and Powers's NJCFA claims as a matter of law thus is appropriate.

### A.   O'Shea Cannot Bring a Claim Under the NJCFA Because She is a California Purchaser.

When this Court sits in diversity, it must apply the choice-of-law rules of the forum state to determine which state's laws will apply to the substantive claims in the case. *See Maniscalco v. Bro. Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). In O'Shea's case, New Jersey choice-of-law rules apply. New Jersey has adopted a two-part test to determine which state's law applies to a given transaction. *Id.* First, the court must "determine whether or not an actual conflict exists between the laws of the potential forums." *Id.* Second, if a conflict exists, the court must "determine which jurisdiction has the 'most significant relationship' to the claim." *Id.* at 207. Under this test, California law must be applied to O'Shea's complaint.

The first prong of New Jersey's choice-of-law test is readily determined. This Court has recognized on a number of occasions that the NJCFA and its California counterpart directly conflict. *See, e.g., Feldman v. Mercedes-Benz USA, LLC*, No. 11-984, 2012 WL 6596830, at *6 (D.N.J. Dec. 18, 2012) (explaining that "the NJCFA materially conflicts with the consumer protection statutes of California"); *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 446 (D.N.J. 2012) (finding that the NJCFA conflicts with its California equivalent because "the NJCFA does

not require a showing of reliance whereas California's consumer protection laws do");
*Maniscalco v. Bro. Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011) (identifying that
the NJCFA and its California equivalent conflict).

As to the second prong, California has the "most significant relationship" to O'Shea's
claim. New Jersey courts use the Restatement (Second) of Conflict of Laws § 148 test to
determine the state with the "most significant relationship" to the plaintiff's claim. *Maniscalco*,
709 F.3d at 207. It is clear that California has the "most significant relationship" to O'Shea's
claim under either of the alternative prongs of that test. The alleged false representations
appeared in advertisements and on labeling in California and were received in California—where
O'Shea made her purchases—which raises a presumption that California law applies, *see*
§ 148(1); even if a court were to conclude that the alleged false representations were made in
New Jersey or Texas by virtue of the Defendants being headquartered in those states, the bulk of
the relevant factors (O'Shea's residence, receiving the allegedly false representations, the
location of the product, purchasing the product[3]) also favor California, § 148(2). *See* Compl.
¶¶ 15-20.

Importantly, the Third Circuit has recognized that "'the mere fact that a company is
headquartered in New Jersey or that unlawful conduct emanated from New Jersey will not
supersede the numerous contacts with the consumer's home state.'" *Maniscalco*, 709 F.3d at
209 (quoting *Montich*, 849 F. Supp. 2d at 449). Thus, courts applying New Jersey choice-of-law
rules—including the Third Circuit and this Court—routinely find that claims brought by out-of-

---

[3] The fact that California is the place of O'Shea's claimed reliance, the place where the plaintiff
received the alleged misrepresentations, and the place where the tangible object that is the
subject of the transaction is located "weigh[s] strongly in favor" of applying California law. And
under the Restatement, the domicile of the Plaintiff is more relevant than the domicile of the
Defendants because the financial loss occurs where the Plaintiff resides. *See Maniscalco*, 709
F.3d at 208.

state plaintiffs who purchased products in their home state are governed by the laws of their home state rather than the NJCFA. *See, e.g., Maniscalco,* 709 F.3d at 208–09; *Feldman,* 2012 WL 6596830, at *5-6; *Montich,* 849 F. Supp. 2d at 446 (D.N.J. 2012); *Weske v. Samsung Elecs. Am., Inc.,* 10-4811, 2012 WL 833003, *4-5 (D.N.J. Mar. 12, 2012); *Arlandson v. Hartz Mountain Corp.,* 792 F. Supp. 2d 691, 709 (D.N.J. 2011); *Nikolin v. Samsung Elecs. Am., Inc.,* No. 10-1456, 2010 WL 4116997, *4 (D.N.J. Oct. 18, 2010); *In re Philips/Magnavox Television Litig.,* No. 09-3072, 2010 WL 3522787, *9 (D.N.J. Sept. 1, 2010); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.,* No. 08-5380, 2010 WL 1424014, *4 (D.N.J. Apr. 8, 2010).

The letters Plaintiffs filed with the Court on November 1, 2013 cited two cases where courts reached a different conclusion. *See* Ltr. Resp. 2, Dkt. 19 (Nov. 1, 2013) (citing *In re Mercedes-Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 64 (D.N.J. 2009); *Smith v. Alza Corp.,* 948 A.2d 686 (N.J. Sup. Ct. 2008)). But those cases are distinguishable. In *Mercedes-Benz,* four of the six Restatement factors applicable to the choice-of-law analysis in certain of the forum states favored applying the law of the plaintiffs' home states because they purchased the products and received the misrepresentations in those states. 257 F.R.D. at 67. But this Court found that the other two Restatement factors favored applying New Jersey law because (1) it was clear that the alleged false statements had emanated from New Jersey; and (2) the only defendant in the case was a New Jersey corporation doing business in New Jersey. *Id.* The Court ultimately found those factors dispositive given the other potential states' lack of a regulatory interest on par with New Jersey's. *See id.* But those two factors do not favor applying New Jersey law here, as Plaintiffs allege that a *combination* of statements from AHA (a non-New Jersey party) and Campbell misled them, there is no allegation that the statements emanated from any particular jurisdiction, and only Campbell is a New Jersey corporation. And in *Smith,* the

plaintiff lived in Alabama but purchased the product in Pennsylvania. 948 A.2d at 688-89. He sued the manufacturer in New Jersey, and the court found that Alabama had no particular interest in applying its law to the transaction because the product was not manufactured or sold in that state. *Id.* at 700-701. Again, O'Shea purchased the product in her home state, and California, whose law is not invoked, thus has a far greater interest than New Jersey.

### B.   Powers Cannot Bring a Claim Under the NJFCA Because He is an Indiana Purchaser.

Plaintiff Powers's NJCFA claim should also be dismissed because, under Indiana's choice of law rules, Indiana law applies to Powers's claim. Powers filed his complaint in the Northern District of Indiana before agreeing to a transfer to this Court. Motion to Transfer, Dkt. 22, *Powers v. Campbell Soup Co., et al.*, No. 13-cv-394-RLM-JEM (N.D. Ind. Dec. 5, 2013). Indiana's choice-of-law analysis therefore applies to his claim. *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011) ("[F]ederal courts in the district to which the case has been transferred . . . must apply the law of the transferor state.").

In Indiana, consumer fraud claims like Powers's are evaluated under choice of law rules relating to torts. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1164-65 (Ind. 2002). "Indiana employs a modified *lex loci delicti* test, which applies the substantive law of the jurisdiction where the tort was committed." *Simon v. United States*, 341 F.3d 193, 198 (3d. Cir. 2003) (quoting *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987). A "tort is said to have been committed in the state where the last event necessary to make an actor liable" takes place. *Hubbard*, 515 N.E.2d at 1073; *Simon*, 341 F.3d at 198. The state where the harm occurred is therefore presumed to be the state whose law will apply—a presumption that can only be overcome if the state "bears little connection to the legal action." *Simon*, 341 F.3d at 198 (quoting *Hubbard*, 515 N.E.2d at 1073; *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d

1012, 1016 (7th Cir. 2002) ("Indiana is a *lex loci delicti* state: in all but exceptional cases it applies the law of the place where the harm occurred.").

Under Indiana law, a consumer fraud tort is "committed" in the state where the consumer relies on the fraud and suffers the financial injury. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1164-65 (Ind. 2002) (holding that the "last event necessary to make an actor liable" for a fraud claim is the place where the plaintiff relied on the misrepresentation and suffered the damage); *Bridgestone*, 288 F.3d at 1017-18 ("If recovery for . . . consumer fraud is possible, the injury is decidedly where the *consumer* is located, rather than where the seller maintains its headquarters. . . . Indiana's choice-of-law rule selects the 50 states and multiple territories where buyers live, and not the place of the sellers' headquarters, for [consumer fraud] suits."); *Klein*, 506 F.3d at 556 ("Indiana's *lex loci delicti* principle points to the location of the injury, not the defendant's corporate headquarters, as the source of law."). Powers alleges that he lives in Indiana, reviewed advertising and labeling in Indiana, and purchased Campbell's Healthy Request soup at a Wal-Mart in Indiana. Powers FAC ¶¶ 13-18. The alleged fraud was thus completed upon Powers's reliance and injury in Indiana. Indiana law therefore presumptively applies to Powers's claim.

Powers cannot rebut that presumption here. Indeed, it is the "rare case" in which the presumption can be overcome. *Klein*, 506 F.3d at 556; *see also Simon*, 341 F.3d at 200 (cross-country flight that randomly crashed in Kentucky had no other connection with the state). Here, the alleged injuries occurred in Indiana. Indiana law, rather that New Jersey law, would apply to a Powers consumer fraud claim, but no Indiana tort is pleaded.

### C.   The Court Should Dismiss O'Shea's and Powers's NJCFA Claims.

Based on the foregoing, O'Shea and Powers cannot maintain their NJCFA claims and those should be dismissed. Plaintiffs' letters contended that it would be premature to determine

at this stage that the NJCFA does not apply. Ltr. Resp. 1, Dkt. 19 (Nov. 1, 2013) (citing *In re Samsung DLP Television Class Action Litig.*, No. 07-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009)). That contention flies in the face of the numerous instances in which this determination has been made on the face of the Complaint as part of a motion to dismiss analysis—*i.e.*, where, as here, a "full factual record" is unnecessary because the facts necessary for making the determination are clear on the face of the complaint. *See, e.g., Feldman v. Mercedes-Benz USA, LLC*, No. 11-984, 2012 WL 6596830, at *5 (D.N.J. Dec. 18, 2012); *Cooper v. Samsung Elecs. Am., Inc.*, 374 Fed. App'x 250, 255 n. 5 (3d Cir. 2010); *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 699-700 (D.N.J. 2011); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, 2010 WL 1424014, at *2-4 (D.N.J. May 27, 2011).

In sum, O'Shea and Powers pleaded facts that make explicit that California and Indiana are the states with the greatest connection to their claims, and plead no connection between themselves and New Jersey other than the "fortuitous location of [Campbell] headquarters" in the state. *Maniscalco*, 709 F.3d at 208. Because Counts I and IV of their respective complaints invoke the NJCFA—a statute wholly inapplicable to them—their NJCFA claims fail as a matter of law. *See, e.g., Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 (3d Cir. 2010).

## IV.   THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE ANY CLAIM AGAINST AHA UNDER THE NJCFA

### A.   The *Twombly/Iqbal* Standard

In addressing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted). The Supreme Court has made clear

that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2006)). The Court must distinguish factual allegations from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and must not draw unreasonable inferences from the alleged facts. *Id.* at 678–79.

Further, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) apply to a complaint under the NJCFA. *See FDIC v. Bathgate*, 27 F.3d 850, 876–77 (3d Cir. 1994); *Donarchy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007, at *2 (D.N.J. 2012) (Bumb, J.). Under Rule 9(b), a plaintiff must identify the "'who, what, when, where and how'" of the alleged fraud, "'or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Donarchy*, 2012 WL 869007, at *2 (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006), and *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Where more than one defendant is involved, group pleading—that is, alleging that two or more defendants together engaged in fraud without specifying the role of each defendant—is improper. *See, e.g.*, *MDNet v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005); *Donarchy*, 2012 WL 869007, at *2.

Finally, the Court must make all legal determinations independently and cannot accept the Plaintiffs' legal characterizations and conclusions as true. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

B.    **Plaintiffs Fail to State a Claim Against AHA Under the NJCFA**

The NJCFA provides, in relevant part:

> The act, use or employment by any person of any . . . deception,
> fraud, . . . misrepresentation, or the knowing, concealment,
> suppression, or omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise or
> real estate, . . . whether or not any person has in fact been misled,
> deceived or damaged thereby, is declared to be an unlawful
> practice.

N.J.S.A. § 56:8-2. To state a claim under this section, a plaintiff must allege facts sufficient to

demonstrate: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiffs;

and (3) a causal relationship between the defendant's unlawful conduct and the ascertainable

loss, all in connection with the sale or advertisement of a product. *See* N.J.S.A. § 56:8-19; *see*

*also, e.g. Frederico*, 507 F.3d at 202; *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J.

2009).

As an initial matter, Plaintiffs have alleged very few statements and almost no conduct on

the part of AHA "in connection with the sale or advertisement" of a product, which necessarily

limits any support for a claim under the NJCFA. N.J.S.A. § 56:8-2. In recognition of the "in

connection with the sale or advertisement" requirement, this Court and New Jersey state courts

have drawn a hard line between general statements made by the defendant (which are not

actionable) and statements made by the defendant *for the purpose of inducing a consumer to*

*purchase* the product complained of (which may be actionable). *See, e.g., DepoLink Court*

*Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579 (N.J. Super. Ct. App. Div. 2013)

(statements made after sale were not made in effort to offer or sell merchandise); *Joe Hand*

*Promotions, Inc. v. Mills*, 567 F. Supp. 2d 719 (D.N.J. 2008) (fraudulent conduct not actionable

where it occurred separate from the sale transaction); *Castro v. NYT Television*, 851 A.2d 88

-14-

(N.J. Super. Ct. App. Div. 2004) (statements made to hospital patients, but not in an effort to induce them to purchase any product, were not actionable under the NJCFA). AHA's licensing of the Heart-Check Mark to Campbell is the only activity alleged that could be connected to the "sale or advertisement of Campbell's Healthy Request Soups. AHA's general nutritional guidance had no connection with the sale or advertisement of specific products.

Nevertheless, in addition to pleading various statements made by Campbell, Compl. ¶¶ 29, 84, Plaintiffs invoke certain statements AHA made as part of its general "dietary, nutrition, and health guidance,"[4] Compl. ¶ 32, to claim that AHA and Campbell have misled the public as to the salt content of Campbell soups bearing the AHA's Heart-Check Mark. But none of the statements identified by the Plaintiffs in the Complaint was made by AHA "in connection with" the sale of any product; they were made—as Plaintiffs admit—either by Campbell (rather than AHA) or by AHA in a "noncommercial" setting, Compl. ¶¶ 4–6, 24, 27, 37–38, 82, 89, 91-92, "unrelated to the Heart-Check mark certification program," Compl. ¶ 25, and in an effort to provide the public with general nutritional guidance. Consequently, the only statements that could properly be a predicate for imposing liability on AHA in this case are the Heart-Check Mark itself and statements that have directly accompanied the Heart-Check Mark. As set forth in the Complaints, those statements include that: food bearing the Heart-Check Mark "Meets Criteria For Heart-Healthy Food," that the food is "Low in Saturated Fat & Cholesterol," and that "Products displaying the heart-check mark meet American Heart Association food criteria for saturated fat and cholesterol for healthy people over age 2." Compl. ¶¶ 43, 79, 98-99.

---

[4] That guidance includes, among others: (1) the recommendation that consumers should aim to consume less than 1500 milligrams of sodium per day; (2) the recommendation that consumers should look for and choose "low-sodium or no salt added canned foods" (*i.e.*, those with "less than 140 milligrams or 5 percent of the Daily Value (DV) per serving" of sodium); and (3) the recommendation that consumers should "shop for the no-salt-added or low-sodium varieties" of canned soups. Compl. ¶ 37.

It is clear that Plaintiffs' factual allegations fall short as to each of the three elements of a NJCFA claim.

>   1.   Plaintiffs Have Not Alleged An Unlawful Practice By AHA.

To state a claim under the NJCFA, a Plaintiff must plead an "unlawful practice." N.J.S.A. § 56:8–2. An "unlawful practice" is one that is "'misleading' and stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer." *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 430 (N.J. 1995). There are three categories of unlawful practices: "affirmative acts, knowing omissions, and regulation violations." *Frederico*, 507 F.3d at 202 (internal quotation marks omitted). Plaintiffs attempt to state their NJCFA claims against AHA as both an "affirmative act"—deceiving consumers on sodium content, and as a "knowing omission"—failing to inform consumers that AHA criteria permit the certification of foods that are not "low sodium."[5]

>   a.   The Facts Alleged Do Not Support A Claim For Consumer
>        Deception By AHA.

To proceed under a theory of deceit, Plaintiffs must demonstrate that the challenged statements would be misleading to a "reasonable" consumer. *See, e.g., Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587, 597–99 (D.N.J. 1990); *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 503 (D.N.J. 2006). The determination as to whether a "reasonable" consumer would be deceived is a question of law for the Court. *See, e.g.,*

---

[5] Plaintiffs allege no false statement of material fact made to induce the buyer to make the purchase. *See Gupta v. Asha Enters., L.L.C.*, 27 A.3d 953 (N.J. Super. Ct. App. Div. 2011); *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496 (D.N.J. 2006). Indeed, they identify no *false* statement at all. Because every AHA statement Plaintiffs identify is literally true, there can be no cause of action for misrepresentation. *See, e.g., Viking Yacht Co., Inc. v. Composite One LLC*, 385 F. App'x 195, 200 (3d Cir. 2010); *Mason v. Coca-Cola Co.*, 774 F. Supp. 2d 699, 703 (D.N.J. 2011); *Wendling v. Pfizer, Inc.*, 2008 WL 833549, at *4 (N.J. Super. Ct. App. Div. 2008). Plaintiffs also make no attempt to show a violation of any regulation.

*Adamson*, 463 F. Supp. 2d at 503 (examining allegedly misleading statements, finding as a matter of law that they "are not misleading or deceptive in any way," and granting motion to dismiss).   The key question is "what was expected at the time of purchase by a reasonable consumer." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 301 (D.N.J. 2009).   Decisional law under the NJCFA treats the reasonable consumer as someone who has some familiarity with the product and competing products,[6] exercises common sense in making purchasing decisions,[7] and will not believe that something is true if it is expressly contradicted on a product's labeling.[8]

Plaintiffs have altogether failed to set forth facts that, if true, would show that a reasonable consumer would believe that Healthy Request soups bearing the Heart-Check Mark contain fewer than 140 mg. of sodium per single recommended serving or possess unique "cardiovascular benefits" not possessed by competing soups with similar nutritional value.

*First*, the contention that consumers are led to believe that Healthy Request soups contain fewer than 140mg. of sodium per serving is entirely unsupported.   The Complaints do not allege that the Heart-Check Mark itself, or any AHA-sponsored statements made on the product labeling with the Heart-Check Mark, say *anything* about sodium—much less that the Heart-Check Mark denotes a "low sodium" product. Compl. ¶¶ 43, 79, 98–99.   Indeed, Plaintiffs allege that the Heart-Check Mark has, at times, been accompanied by a statement that the product is "Low in *Saturated Fat & Cholesterol*," Compl. ¶ 79 (emphasis added), and that

---

[6] *See In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*, No. 08–939, 2009 WL 2940081, at *10–13 (D.N.J. 2009) (court presumed consumer knowledge of "winner-take-all" battle between HD DVD format and Blu-ray format, such that average consumer could not possibly believe that Toshiba would continue to support HD DVD devices even after their obsolescence).

[7] *Int'l Minerals and Mining Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587 (D.N.J. 1990).

[8] *Mason v. Coca-Cola Co.*, 774 F. Supp. 2d 699 (D.N.J. 2011); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 301 (D.N.J. 2009).

"Products displaying the heart-check mark meet American Heart Association food criteria for *saturated fat and cholesterol* for healthy people over age 2," Compl. ¶¶ 98, 99 (emphasis added). Conspicuously absent from the mark and accompanying statements is any statement about the product's sodium content.

Nor do the Complaints allege that Healthy Request soup labeling or advertising claims a sodium content other than the 410 mg. prominently displayed on the soup's nutritional label. *See* Compl. ¶¶ 27, 90, 95 (stating that Healthy Request soups contain 410 mg. of sodium per serving).[9]   Campbell is required by federal law to disclose the amount of sodium per recommended single serving, and there is no allegation that it failed to do so on its Healthy Request soups. *See* 21 C.F.R. § 101.9(c)(4).  Indeed, Campbell's Healthy Request labeling often displays per-serving sodium content on the *front* of the can as part of the Grocery Manufacturers Association's "Facts up Front" campaign.  The Heart-Check Mark, by contrast, is on the *side* of the can.  Thus, it is often easier for a consumer to discover that Healthy Request soups contain 410 mg. of sodium per serving than to access the Heart-Check Mark.

Although Plaintiffs contend that a reasonable consumer would impute AHA's aspirational consumer daily sodium guidance to any product bearing the Heart-Check Mark, they plead no facts supporting such a leap.  The Complaints accurately note that certain AHA nutritional guidance advises consumers to choose foods with the least amount of sodium, including "low sodium" foods containing fewer than 140 mg. of sodium per serving, to aid in limiting daily sodium intake to no more than 1,500 mg.  Compl. ¶ 37, 89.  But the Complaints are silent as to why a "reasonable" consumer would: (1) be aware of that "low sodium" guidance; (2) understand that "low sodium" means having a sodium content of less than 140 mg.

---

[9] Campbell has attached to its motion, filed concurrently with this Motion, the full label from which the banner reprinted in the Complaint at Paragraph 79 was extracted.

per serving; (3) view the Heart-Check Mark as an indicator of compliance with such a standard; and (4) make a purchase based on that conclusion without reviewing or in spite of reviewing either the Heart-Check criteria or the nutritional labeling.

Decisions from this Court under the NJCFA demonstrate that Plaintiff's claims of deceit cannot withstand scrutiny. In *Mason v. Coca-Cola Co.*, 774 F. Supp. 2d 699 (D.N.J. 2011), the plaintiff alleged that a label's statement that Diet Coke Plus contained "vitamins and minerals" misled consumers into believing that the drink was "healthy." The court found that the nutritional label disclosed the beverage's actual nutritional contents, that the drink in fact contained "vitamins and minerals," and that no reasonable consumer could possibly believe that the drink contained any more "vitamins and minerals" than disclosed in the beverage's nutritional label. *Id.* at 703–04. *See also McKinnis v. Gen. Mills, Inc.*, No. 07-2521, 2007 WL 4762172, at *3 (C.D. Cal. Sept. 18, 2007) (holding that cereal box depictions of fruit were not misleading as a matter of law because although product contained no fruit, a "reasonable consumer would then be expected to peruse the product's contents simply by reading the side of the box containing the ingredient list"). And in *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282 (D.N.J. 2009), the plaintiffs brought a claim under the NJCFA alleging fraud because the printer cartridges they purchased stopped printing after 2,500 copies, leaving the toner cartridge 40% full. But the product packaging prominently stated only that the cartridges would print up to 2,500 copies. In dismissing the case for failure to state a claim, this court found that the plaintiffs "inexplicably expected to be able to print to the very last drop of toner, irrespective of [the defendant's] explicit disclosure that the toner provides up to a certain number of pages." *Id.* at 301 (emphasis omitted); *see also id.* (the court will not credit the plaintiff's "own subjective" view of what was promised if it is not also "reasonable").

Plaintiffs' letters relied on *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) and *Stewart v. Smart Balance, Inc.*, No. 11-6174, 2012 WL 4168584, at *9 (D.N.J. June 26, 2012) to support Plaintiffs' argument that the conclusions a consumer draws from the presence of a Heart-Check Mark on the side of the can may be "reasonable" even if they are conclusively refuted by information prominently disclosed in the product's nutritional labeling. Ltr. Resp. 2, Dkt. 19 (Nov. 1, 2013). But those decisions are distinguishable. *Williams* involved a toddler snack called "Gerber Fruit Juice Snacks," which depicted oranges, peaches, strawberries, and cherries; the ingredient list on the side panel of the box disclosed that the snacks contained no juice from any of those fruits. 552 F.3d at 936. The conclusion that the plaintiffs in that case drew—that the snacks were made from the "juice" of the "fruits" depicted on the front of the box—was deemed reasonable given the name of the snack and the pictures, an understanding it was arguably unnecessary for the consumer to verify from the nutritional labeling. And in *Stewart*, where the subject product stated nine times on the labeling that it was "fat free"; it was certainly reasonable for a consumer to believe that the product was fat free, and there would be no reason to examine the labeling to confirm it. 2012 WL 4168584, at *9. But here, there is no similar express representation permitting a sodium content conclusion to be drawn from the presence of a Heart-Check Mark; the Heart-Check Mark itself says nothing about sodium, and as for the product, it is not, for instance, called "Low Sodium Soup," nor does it contain "low sodium" verbiage on the labeling. Thus, the consumer interested in purchasing a "low sodium" product finds no support for a "low sodium" conclusion on the face of the product, contrary to the situations in *Williams* and *Stewart*. Moreover, as discussed elsewhere, the sodium content of Healthy Request soups and the Heart-Check Mark are displayed with equal prominence. *Williams* and *Stewart* are inapposite.

Plaintiffs also rely, somewhat ironically, on *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84 (D.N.J. 2011). In *Smajlaj*, the plaintiffs alleged that they were misled by statements on cans of Campbell tomato soup that claimed the soup claimed "25% less sodium" and "30% less sodium." The court found that the complaints stated a claim for deception because it was unclear to the consumer what "25% less" and "30% less" referred to—*i.e.*, the consumer had no point of reference and could not be expected to bring knowledge of the sodium content of any comparator product to the purchasing decision. *Id.* at 98-99. Here, by contrast, Plaintiffs claim that the reasonable consumer would bring a wealth of information to bear on the purchasing decision, with the result that the Heart-Check Mark, which on its face says nothing about being a "low sodium" food, becomes an implied guarantor of "low sodium." *Smajlaj* therefore does not advance Plaintiffs' argument.

In sum, the claim that any buyer (much less a sodium-conscious consumer—the only consumers who could be "harmed" by a low-sodium claim) would believe that Healthy Request soups contain 140 mg. or less of sodium per serving strains credulity. If such a buyer exists, she certainly is not "reasonable" and outside the legal standard for NJCFA actions.

*Second*, Plaintiffs fail to allege facts sufficient to show that a "reasonable" consumer would be led to believe that soups bearing the Heart-Check Mark are superior to nutritionally equivalent soups that do not. Plaintiffs allege nothing about the Heart-Check Mark itself, or any statements made by AHA in connection with the Heart-Check Mark, from which one could reasonably infer that AHA or Campbell were comparing Healthy Request soups to nutritionally equivalent competing products or that AHA had reviewed any competing product and denied it Heart-Check approval. Certainly the mark itself is not susceptible to that interpretation: it says only that the labeled product bearing that mark "Meets Criteria For Heart-Healthy Food."

Compl. ¶ 43. There is no negative statement or implication, or any statement of relative value for that matter. Moreover, Plaintiffs' Complaints confirm that the Heart-Check Mark has directed consumers to the Heart-Check Food Certification program website, which makes clear that the certification process begins with manufacturers deciding to seek certification for their products, rather than AHA seeking to test every product of a specific type in the marketplace.[10] And finally, the "reasonable" consumer, confronted with a mark stating that the food meets AHA certification criteria, would merely have comfort that the marked product in fact meets those criteria. The conclusion that Plaintiffs claim to draw, by contrast, is not at all "reasonable," as no "reasonable" person could think that two nutritionally equivalent soups could nevertheless possess different heart-health benefits. *See Arcand*, 673 F. Supp. 2d at 302 (consumer's "own subjective" view of the product may not be "reasonable").

For these reasons, Plaintiffs have not pled a "plausible" basis for finding that the Heart-Check Mark deceives reasonable consumers. Because that determination can be made on the face of the Complaint and as a matter of law, dismissal is appropriate. *See Stewart*, 2012 WL 4168584, at *9 (citing *Leon v. Rite Aid Corp.*, 774 A.2d 674, 678 (N.J. Sup. Ct. App. Div. 2001); *Mason*, 774 F. Supp. 2d at 703; *Adamson*, 463 F. Supp. 3d at 504.

        b.     The Facts Alleged Do Not Support A Knowing Omission By AHA.

---

[10]    American Heart Association, *Heart Check Food Certification Program*, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Program_UCM_300133_Article.jsp. (www.heartcheckmark.org cited in Compl. ¶¶ 79, 98-99). AHA may rely on these materials because Plaintiffs reference them in the Complaints and relied on them in drafting their Complaints. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196–97 (3d Cir. 2010) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" because "[w]hen a complaint relies on a document. . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished").

Plaintiffs also do not plead any knowing omission on the part of AHA. Plaintiffs allege only one "omission": that "AHA and its corporate clients . . . conceal from consumers the truth that AHA employs a different—and far less stringent—set of criteria when it certifies food products under its Heart-Check Mark certification program than when it offers disinterested nutritional guidance." Compl. ¶ 57. But this allegation fails for two critical reasons.

*First*, Plaintiffs' Plaintiffs' Complaints confirm that the Heart-Check Mark has directed consumers to a website dedicated to the Heart-Check Food Certification program— heartcheckmark.org. Compl. ¶¶ 79, 98-99. Prominent on that website are the full Heart-Check criteria.[11] Indeed, the lack of any allegation that Plaintiffs discovered the difference between the Heart-Check criteria and AHA's aspirational guidance through their own investigation or testing is a tacit admission that they themselves "discovered" this allegedly "concealed" information from material publicly provided by AHA. The fact that the criteria are freely available to the public at least means that Plaintiffs cannot say that AHA has "concealed" anything.

*Second*, and critically, the complaints fail to allege any facts demonstrating that AHA *knowingly* concealed its Heart-Check Food Certification program standards with the *intent to deceive* the public into believing that its standards are no different from its "noncommercial" guidance. *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 538 (D.N.J. 2012) ("Intent to defraud . . . is an element of unlawful practice by knowing omission."); *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, No. 08-1057, 2008 WL 5381227, *6 (D.N.J. Dec. 17, 2008) ("[W]hen the consumer fraud is an omission, intent is an essential element of the charge."). Indeed, Plaintiffs fail to support their "omission" theory with *any* additional factual

---

[11] American Heart Association, *AHA Heart Check Program Nutrition Requirements*, http://www.heart.org/idc/groups/heart-public/@wcm/@fc/documents/downloadable/ucm_439218.pdf.

allegations beyond those that support their other "unlawful practice" theories.  These general allegations as to alleged affirmative representations by AHA cannot likewise suffice for pleading an intentional and knowing omission by AHA.  *See Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 839 A.2d 942, 962 (N.J. Super. Ct. Law Div. 2003) ("The same language in Ricoh's promotional material cannot be construed both to be an affirmative representation, as initially argued by plaintiffs, and as concealment of a material fact as they have later asserted.").

Accordingly, Plaintiffs' complaints fail to set forth facts that, if true, would demonstrate that AHA intentionally concealed its Heart-Check criteria from the public for the purpose of deceiving the public.

> 2.     The Facts Alleged Do Not Support An Ascertainable Loss.

Plaintiffs' claims also founder for want of an ascertainable loss, a required element under the NJCFA.  Plaintiffs appear to base their allegations of loss on a benefit-of-the-bargain theory—*i.e.*, that they allegedly paid a premium for what they wrongly thought was "low sodium" soup.  But the Complaints contain no basis for determining the value a reasonable consumer would place on "low sodium" or other unspecified "cardiovascular benefits" because there are no relevant sodium-related price comparisons set out in the Complaints.

Plaintiffs plead a retail price difference between Healthy Request soups and "regular" Campbell and store-brand soups.[12]  Compl. ¶ 76.  But that comparison is inapposite because the Plaintiffs do not allege that "regular" soups are nutritionally equivalent to the soups they purchased.  In *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84 (D.N.J. 2011), for instance, the

---

[12] The fact that Plaintiffs O'Shea and Powers rely on the price difference between Campbell's Healthy Request soups and Wegmans private-label condensed tomato soup makes their "ascertainable loss" arguments particularly implausible, given that Powers lives approximately 400 miles, and O'Shea lives approximately 2,400 miles, from the nearest Wegmans store.  It is highly implausible on its face, for instance, that O'Shea drove 37 hours to compare the price of soup.

plaintiffs alleged that they paid a premium for soup that they believed was lower in sodium than regular Campbell soup, but received soup that contained the same amount of sodium; the price comparison to regular Campbell soup was therefore tied to the alleged lost benefit of the bargain. *Id.* at 89.

Here, Plaintiffs allege that they paid for "low sodium" soup and received only "lower sodium" soup, but they readily acknowledge that they received a product for their money that was superior to "regular" soup. Compl. ¶¶ 27, 90. Under their theory of the case, it appears their claimed benefit-of-the-bargain loss would be the price difference between a hypothetical "low sodium" soup and the "lower sodium" Healthy Request soup that they actually purchased. But the price of a hypothetical or alternative "low sodium" version of the soups that they purchased is not alleged in the Complaint. And while Plaintiffs allege that they believed they were receiving soup that was somehow superior to nutritionally equivalent soups not bearing the Heart-Check Mark, they have set forth no facts showing a price difference between the Healthy Request soups they purchased and nutritionally equivalent soups not bearing the Heart-Check Mark. Without these facts, it is impossible to adequately "quantif[y] or measur[e]" Plaintiffs' alleged loss. *Franulovic v. Coca Cola Co.*, No. 07-539, 2007 WL 3166953, at *7 (D.N.J. Oct. 25, 2007) (internal quotation marks omitted) (Bumb, J.); *Arcand*, 673 F. Supp. 2d at 300 ("When pleading a benefit-of-the-bargain loss, the plaintiff must allege 'the difference between the [product] she received and the [product] as represented at purchase.'") (quoting *Romano v. Galaxy Toyota*, 945 A.2d 49, 58 (N.J. Super. Ct. App. Div. 2008)) (alterations in original). Baldly alleging that they paid more, without any attempt to quantify that amount, is insufficient. *See Smajlaj*, 782 F. Supp. 2d at 99 (a plaintiff must "*quantify* the difference in value between the promised product and the actual product") (emphasis added).

-25-

The Court should dismiss Plaintiffs' Complaint for this separate and adequate reason: the plaintiffs' failure to plead "ascertainable loss." *See, e.g., Franulovic*, 2007 WL 3166953, at *11 ("[B]ecause [plaintiff] has failed to adequately allege an ascertainable loss, the CFA claim will be dismissed."); *Solo v. Bed Bath & Beyond, Inc.*, No. 06-1908, 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007) (dismissing plaintiff's complaint where "Plaintiff fail[ed] to specifically allege that what he did receive[] was of lesser value than what was promised").

3.   Plaintiffs Have Not Alleged A Causal Nexus Between An Unlawful Practice By AHA And An Ascertainable Loss.

Finally, in the unlikely event that the Court were to find that Plaintiffs have validly alleged both an "unlawful practice" and an "ascertainable loss," the Plaintiffs' NJCFA claims must still be dismissed because Plaintiffs have also failed to plead a "causal relationship" between the alleged unlawful practice and ascertainable loss. *See Int'l Union*, 929 A.2d at 1088; *Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 814 (N.J. Super. Ct. App. Div. 2000) ("[C]onsumer fraud requires . . . proof of a causal nexus between the concealment of the material fact and the loss."); *Solo*, 2007 WL 1237825, at *3.

Plaintiffs baldly assert that they purchased Healthy Request soups at a higher price only because of the "unlawful practice" of deceiving them into believing that the soups are "low sodium" or superior to nutritionally equivalent competing products.  But the Court need not accept that conclusion if the Complaint supports a more plausible explanation. *See Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494, 507 (D.N.J. 2012) (dismissing CFA claim where the plaintiffs' complaints set forth facts—other than the defendant's unlawful practice—that could account for the price difference between products).  Indeed, the allegations in the Complaint make it just as likely that any premium price charged for Healthy Request soups is a result of their certified nutritional benefits over "regular" Campbell soups—benefits

Plaintiffs acknowledge.  Compl. ¶¶ 27, 90.  There is nothing in the Complaints that would tie the purchasing decision to an "unlawful practice" as opposed to that clear nutritional difference.

Indeed, Plaintiffs do not even allege that AHA (or Campbell's, for that matter) set the retail price for Healthy Request soups, meaning that it is just as plausible that the retailer is responsible for charging any premium.  And because Plaintiffs fail to plead any price difference between Healthy Request soups and nutritionally equivalent competitor products (or the absence of other facts or circumstances that ordinarily would account for a price difference, such as retailer profit, brand recognition, customer taste preferences, and cost of manufacture), it is impossible to determine if any ascertainable loss is caused by a mistaken belief in product superiority.  Given that the nutrient contents of every soup are clearly disclosed on the product's labeling, the reasonable consumer received exactly that for which she paid.

C.   **Plaintiffs May Not Pursue Their Disagreement With AHA's Heart-Check Standards Through A NJCFA Action.**

At bottom, Plaintiffs' quarrel appears to be with the Heart-Check sodium criteria AHA employs, as opposed to an "unlawful act" on AHA's part.  This substantive policy disagreement cannot be transformed into an actionable fraud claim.

AHA's mission is to help people build healthier lives, free of cardiovascular diseases and stroke.  Compl. ¶ 20.  While Plaintiffs correctly note that AHA advises the public to aim to consume an average of no more than 1,500 mg. of sodium per day and to choose no-salt-added and reduced-sodium foods as part of an effort to meet that goal, Compl. ¶¶ 37, 89, AHA faces a world in which the average American's sodium intake is 3,400 mg. per day, and many of the foods available to consumers contain sodium well in excess of the FDA "healthy" claim limitation of 480 mg of sodium per serving.  AHA's Heart-Check Food Certification program is intended as a way to bridge that gap by identifying foods that—while not necessarily "low

sodium"—contain less than 480 mg. of sodium per serving and, taking into account many identified nutritional factors, can contribute to an overall healthy diet.

The Heart-Check Food Certification program is intended as one way to help consumers construct a heart healthy diet. AHA has identified certain categories of foods (*i.e.*, those meeting AHA's nutritional criteria) that make them nutritionally better choices than many foods that consumers might otherwise purchase. AHA tests and retests those foods when necessary to ensure they in fact comply with the Heart-Check criteria, and allows manufacturers to place the AHA Heart-Check Mark on those foods only as long as they continue to meet Heart-Check criteria and the manufacturer desires to participate in the program. These foods can be consumed in a manner completely consistent with AHA's guidance, while pursuing consumption of no more than 1500-mg. per day of sodium, and provide other heart-healthy nutritional benefits as well. Looking for the Heart-Check Mark on food packaging can therefore be a good first step in creating a sensible overall eating plan. The program also acts as an incentive for manufacturers to reformulate their products to meet the program criteria, thereby making foods with lower amounts of sodium, fats, and cholesterol available to the public.

Plaintiffs' attack on AHA's pragmatic program apparently stems in part from an erroneous belief that AHA has simply adopted the FDA's minimum nutritional standards, Compl. ¶¶ 22, 44, and that the Heart-Check Mark is therefore no more meaningful to consumers than any other generic heart mark. FDA requirements certainly inform the AHA Heart-Check Food Certification program. But AHA's program is not simply a replica of the FDA's minimum standards for making heart-health claims about foods. AHA used its own judgment, developed its own requirements, and created its own process for determining whether a particular product complies with the relevant AHA criteria and is suitable for certification.

Plaintiffs apparently believe that AHA should not lend its mark to any food that is not a "low sodium" food. But AHA has never stated—and does not believe—that improving heart health with diet is an all-or-nothing proposition based on each single food choice. Heart-healthy eating requires attention to overall dietary choices in the real world. Plaintiffs do not allege otherwise. AHA believes that a heart-healthy diet can be more easily constructed using foods that have the Heart-Check Mark than with randomly selected foods in the same categories. In a world of imperfect food choices, AHA is committed to helping consumers make better food choices and encouraging manufacturers to produce healthier products, both of which the Heart-Check Mark appropriately does. There thus is no inconsistency between AHA's nutritional guidance and its Heart-Check Food Certification program, and no possible fraud.

## V.   POWERS FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AS TO AHA

Unlike O'Shea and Waldron, Powers makes an unjust enrichment claim against AHA. Powers FAC ¶ 142. This allegation is puzzling because AHA does not sell soup to the public and derives no pecuniary benefit from consumers. Because Powers cannot maintain a claim for unjust enrichment against AHA, that claim should be dismissed.

To state an unjust enrichment claim under applicable Indiana law (or New Jersey law for that matter), the plaintiff must allege that the plaintiff conferred a benefit under circumstances in which it would be wrongful for the defendant to retain that benefit. *Compare Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) ("To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust."); *with Mason v. Coca-Cola Co.*, No. 09-220, 2010 WL 2674445, at *7 (D.N.J. Mar. 23, 2011) ("In order to state a claim for unjust enrichment under New Jersey law, a plaintiff

must allege that: (1) defendant received a benefit, (2) at plaintiff's expense, (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it.").

Powers alleges erroneously that Campbell, which does not sell or price to consumers, "charged a higher price for its Healthy Request soup products than the products' true value, and Campbell's obtained monies that rightfully belong to Plaintiff and the other Class members." Powers FAC ¶ 144. Further, Powers alleges that "Campbell's accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members . . . [and that] [i]t would be inequitable and unjust for Campbell's to retain these wrongfully obtained profits." *Id.* ¶ 145. Powers makes no allegation that *AHA* received any sale proceeds. These allegations fail to state an unjust enrichment claim against AHA for at least two reasons.

First, Powers does not allege that he or any member of the putative class conferred a benefit on *AHA* or that *AHA* has wrongfully retained that benefit. *See Zoeller*, 904 N.E.2d at 220 ("[A] claimant must establish that a measurable benefit has been conferred on the defendant[.]"); *see also Mason v. Coca-Cola Co.*, 2010 WL 2674445, at *7 (plaintiff must allege that "defendant received a benefit . . . at plaintiff's expense"). Powers's Complaint focuses solely on *Campbell's* benefit—*i.e.*, that Campbell charged a higher price for soup and that Campbell kept any such premium. Powers fails to allege that AHA—either directly or indirectly—received any of the allegedly inflated purchase price of Healthy Request soup.

Second, even if Powers had alleged that, contrary to fact, he conferred a benefit on AHA (as opposed to Campbell), Powers fails to allege that AHA's retention of any such benefit would be "unjust." *See, e.g.*, *In re Cheerios Marketing & Sales Practices Litig.*, No. 09-2413, 2012 WL 3952069, at *13 (D.N.J. Sept. 10, 2012). Indeed, as described above, *see supra* AHA's

Memorandum, pp. 27-28, the Healthy Request soup Powers purchased indisputably conformed to AHA's certification guidelines, which are the criteria that they purported to meet.  Further, although Powers alleges that he paid more for Healthy Request soups than regular soups, the higher price could equally be explained by the nutritional superiority of Healthy Request soups. Thus, even if one ignores that AHA did not sell Powers anything or receive any benefit from the sale of Healthy Request soups, there still would be nothing inherently "unjust" in Powers paying more for soup that is nutritionally superior to regular soup. *See Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1125 (S.D. Ind. 2011).

By failing to allege each of the essential elements of an unjust enrichment claim against AHA, Powers has failed to allege a claim that is plausible on its face as to AHA. *See Iqbal*, 556 U.S. at 677-78.  The claim must be dismissed.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs have failed to state a claim against AHA under the NJCFA upon which relief can be granted.  Plaintiff Powers has also failed to state a claim for unjust enrichment against AHA.  The Court should grant AHA's motion to dismiss and dismiss all claims against AHA by all Plaintiffs.

Respectfully submitted,

*s/ Michael J. Vassalotti*
Michael J. Vassalotti, Esquire
**BROWN & CONNERY, LLP**
360 Haddon Avenue - P.O. Box 539
Westmont, New Jersey 08108
(856) 854-8900
mvassalotti@brownconnery.com

Bert W. Rein, Esquire
**WILEY REIN LLP**
1776 K Street, NW
Washington, DC  20006
(202) 719-7000

BRein@wileyrein.com

*Attorneys for Defendant American Heart Association, Inc.*

Dated:  January 31, 2014